**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| GEORGE PAR, and IVYR PLLC d/b/a/ PAR RETINA, | Case No. ___ |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| WOLFE CLINIC, P.C., JARED S. NIELSEN, KYLE J. ALLIMAN, and DAVID D. SAGGAU, | **Jury Trial Demanded** |
| Defendants. | |

Plaintiffs George Par and IVYR PLLC ("Par Retina") state as follows for their

Complaint:

### Statement of the Case

1.      Wolfe Clinic, P.C. ("Wolfe Clinic") and three of its individual owner-physicians

(Dr. Jared S. Nielsen, Dr. Kyle J. Alliman, and Dr. David D. Saggau) have engaged in

anticompetitive and exclusionary practices to ensure Wolfe Clinic maintains a monopoly over

the vitreoretinal care market in the Des Moines, Ft. Dodge, and Spencer areas.  In the words of

Dr. Alliman, "gone are the days of concern with regards to stepping on some toes to expand our

market, we can become the market."  Accordingly, when Dr. Par emerged as a potential

competitor who might ease Wolfe Clinic's stranglehold over the provision of vitreoretinal care in

Des Moines, Ft. Dodge, and Spencer, Defendants schemed to defame Dr. Par, prevent Dr. Par's

existing patients from seeing him, and—in a practice it has long used against competitors—dry-

up his referral sources and potential referral sources.

2.      Wolfe Clinic's conduct has not only caused Dr. Par substantial loss, it has also

diminished patient choice and access to quality care.  Patients in Des Moines, Ft. Dodge, and

Spencer who require retina care have suffered incalculable injury from Wolfe Clinic's attempts

to drive Dr. Par from the market and prevent new entrants to the market by locking-in referral

sources.  These patients have been unable to receive the quality of care they would receive in a

competitive marketplace.  They face long wait times, a backed-up waiting room, and harried

doctors and nurses who cannot devote the time and attention to patient care that is sometimes

required.

3.      Dr. Par emerged as a competitor after working at Wolfe Clinic for approximately

four years.

# REDACTED

# REDACTED

REDACTED            Wolfe Clinic and the Individual Defendant Doctors,

however, wished to maintain their monopoly over the vitreoretinal care markets in Des Moines,

Ft. Dodge, and Spencer.  To shut Dr. Par out of these marketplaces, Defendants intentionally and

maliciously initiated a campaign to spread verifiably false and defamatory statements to interfere with Dr. Par's referral network of medical professionals and discourage others from making referrals to Dr. Par, and redoubled their efforts to eliminate independent referral sources by purchasing small optometry practices and directing, to its own retina surgeons, the referrals these optometrists controlled.

**REDACTED** the Individual Defendant Doctors lied to referring physicians and optometrists and Dr. Par's patients and prospective patients. **REDACTED** they wrongly instructed Wolfe Clinic staff and employees to lie to patients when they inquired about Dr. Par and to tell patients that they did not know Dr. Par's whereabouts.

7.     The Individual Defendant Doctors and Wolfe Clinic acted with the intent to financially harm Dr. Par, damage his reputation, and drive him from the vitreoretinal care market to maintain their monopoly over the vitreoretinal care markets in Des Moines, Ft. Dodge, and Spencer.  Their actions were of such a wrongful, flagrant, and anticompetitive nature as to justify the award of punitive damages, compensatory damages, attorneys' fees, and exemplary damages under Iowa Code § 553.12 of twice the actual damages incurred as a result of Defendants' exclusionary practices and under Section 4 of the Clayton Act of three times the actual damages incurred as a result of Defendants' exclusionary practices.

### Parties

8.     Dr. Par is a fellowship-trained ophthalmologist who specializes in vitreoretinal surgery.  A vitreoretinal surgeon is an ophthalmologist with special expertise in the management of conditions at the back of the eye which require surgical treatment, such as retinal detachment,

epiretinal membrane, ocular trauma, complicated diabetic eye disease, macular degeneration, complications of cataract surgery, and endophthalmitis.

9.      Dr. Par's father came to the United States from Greece at the age of 18.  Despite growing up in Queens, New York, Greek was his first language.

10.      Dr. Par received his Doctorate of Medicine from New York University, and completed his ophthalmology residency at New York-Presbyterian Hospital/Weill Cornell Medical Center.  He then completed a two-year vitreoretinal surgical fellowship at Rush University with Illinois Retina Associates.  Dr. Par started seeing patients at Wolfe Clinic in Iowa in 2016.  In 2018 he became a shareholder and member of Wolfe Clinic's Board of Directors.

11.      Upon leaving Wolfe Clinic in 2020 Dr. Par became the founder and owner of Par Retina in Clive, Iowa.  He resides in Polk County, Iowa.

12.      Par Retina is an Iowa professional limited liability corporation based in Polk County.  Par Retina provides services in the Des Moines area, Spencer, and Ft. Dodge.

13.      Dr. Par entered into an employment agreement (the "Employment Agreement") with Defendant Wolfe Clinic, P.C. in 2016.

14.      Defendant Wolfe Clinic is a professional corporation organized and operating in accordance with the laws of the State of Iowa, with a principal business address of 309 E. Church Street, Marshalltown, IA 50158.  Wolfe Clinic has offices across the State of Iowa, including 5900 E University Avenue, Pleasant Hill, IA 50327 in Polk County.  Wolfe Clinic has a monopoly over retina surgery in the Des Moines, Spencer, and Ft. Dodge areas.

15.     Defendant Dr. Jared S. Nielsen is an ophthalmologist and a shareholder and member of the Board of Directors of Wolfe Clinic.  Upon information and belief, Dr. Nielsen resides in Dallas County, Iowa.

16.     Defendant Dr. Kyle J. Alliman is an ophthalmologist and a shareholder and member of the Board of Directors at Wolfe Clinic.  Upon information and belief, Dr, Alliman resides in Polk County, Iowa.

17.     Defendant Dr. David D. Saggau is an ophthalmologist and a shareholder and member of the Board of Directors at Wolfe Clinic.  Upon information and belief, Dr. Saggau resides in Polk County, Iowa.

## Nature of the Case

18.     Dr. Par is a highly trained and skilled vitreoretinal surgeon. He completed a total of eleven years of training after graduating from New York University.  Vitreoretinal surgery is an exceedingly complicated field that has been undergoing a period of rapid modernization in treatment modalities and standards of care over the past decade.

19.     Dr. Par was recruited to Iowa to join Wolfe Clinic, a large Iowa provider with approximately 29 specialists in ophthalmology, and subspecialties within the practice of ophthalmology, as well as 17 optometrists. It has well over 400 employees and 21 locations throughout Iowa.  Wolfe Clinic controls a huge share of the vitreoretinal care market in Des Moines, Fort Dodge, and Spencer.  On information and belief, Wolfe Clinic controls approximately 70% of the Des Moines vitreoretinal caremarket, and nearly 100% of the vitreoretinal care market in Spencer and Ft. Dodge.

**REDACTED**

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

30.     Defendants' anticompetitive scheme included giving instructions to staff that staff was to falsely advise inquiring patients that they did not know Dr. Par's whereabouts.

31.     Defendants' anticompetitive scheme included deliberately failing to tell patients that Dr. Par is still practicing.

32. Defendants' anticompetitive scheme included communicating defamatory statements about Dr. Par to its staff, employees, and patients as more fully set forth below.

33. Defendants' anticompetitive scheme included preparing a written script pursuant to which Wolfe Clinic staff were directed to mislead patients who inquired about Dr. Par and to dissuade them from being treated by Dr. Par.

34. Defendants' anticompetitive scheme included contacting current and potential referring optometrists and physicians and discouraging them from either continuing or establishing a referral relationship with Dr. Par.

35. Defendants' anticompetitive scheme included contacting out-of-state members of the ophthalmology community and making disparaging remarks about Dr. Par.

36. Defendants' anticompetitive scheme included lying to staff and employees REDACTED REDACTED and discouraging them from maintaining any relationship with Dr. Par.

37. Defendants' anticompetitive scheme also included threatening Wolfe Clinic staff and employees that there would be repercussions if they assisted Dr. Par in any way with his new practice and directing them that they were to provide Defendants with any information they learned about Dr. Par's practice.

38. Defendants' anticompetitive scheme included wrongly and falsely telling staff that if they were in any way to cooperate with or work with Dr. Par they would face legal repercussions.

39. Fueled by a desire to maintain control over the Des Moines, Ft. Dodge, and Spencer vitreoretinal care markets, the elements of this scheme directly interfered with and

impaired the rights of Dr. Par's patients to continue their treatment with him and access to the doctor of their choice.  As a result, patient care suffered.

40.     Dr. Par and Par Retina bring this action for damages and injunctive relief against the Wolfe Clinic and Individual Defendant Doctors to prevent their unlawful anticompetitive behavior, prevent them from further defaming him, stop them from tortiously interfering with his relationship with current and prospective patients and referral sources, and to recover compensatory and punitive damages for the harm done to his reputation and practice.  Dr. Par also seeks to **REDACTED** **REDACTED** recover attorneys' fees, and recover exemplary damages for Wolfe Clinic's anticompetitive conduct.

## Venue and Jurisdiction

41.     This Court has jurisdiction over this case under 28 U.S.C. § 1331 because it involves issues arising under federal antitrust laws.

42.     This Court has venue over this action because it arises out of injuries that occurred in the Southern District of Iowa to Dr. Par, a Polk County resident.  Wolfe Clinic has at least one office located in Polk County, Iowa, and two of the Individual Defendant Doctors are Polk County, Iowa residents.

# REDACTED

## Allegations

**A.     Wolfe Clinic hires Dr. Par, who is immediately successful.**

44.     Early in his career, Dr. Par recognized that Iowa needed ophthalmologists who could perform retina surgery.  He saw Iowa as a place where he could build his practice in an underserved market.  Accordingly, he decided to interview at Wolfe Clinic.

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED





**F.      To protect its market share, the Wolfe Clinic engages in exclusionary and anti-competitive conduct that includes defaming Dr. Par and interfering in Dr. Par's relationship with patients and potential patients.**

89.      On approximately February 12, 202l, Wolfe Clinic sent a letter to Dr. Par's

patients.  The letter stated:

> Another change you may already be aware is that as of October 30, 2020, Dr. George Par is no longer seeing patients as physician with Wolfe Clinic and is no longer affiliated with Wolfe Clinic.  Wolfe Clinic and Dr. Par have reached an agreement regarding their separation and both parties believe that this agreement is in the best interest of their

respective patients and the community.  Rest assured, Wolfe Clinic will continue to serve you as our patient at our state-of-the-art existing locations you've come to count on.  In addition, we are on call at all our locations 24 hours a day, 7 days a week.  When you call to schedule your next appointment, our staff will schedule you to receive from one of our experienced retina specialists.



91.     Wolfe Clinic not only failed to inform Dr. Par's patients that he would continue

seeing patients in the area, but it also actively made it appear that he was no longer seeing

patients at all.  By informing patients that "Wolfe Eye Clinic will continue to serve you as our

patient," it gave patients no indication that they had the option to choose Dr. Par as their eyecare

provider.

93.     Another theme of this February 2021 letter is that a patient's best interest is in

staying with Wolfe Clinic, and not in continuing their care with Dr. Par.  The letter clearly and

knowingly draws a disparaging contrast between the medical care and services provided by Dr.

Par as a sole practitioner and the care and services provided by Wolfe Clinic.



95.     Patients read the misleading wording in the letter, and many logically assumed

that Dr. Par was no longer practicing anywhere.

REDACTED                             Dr. Nielsen angrily told staff that he

wanted to see Dr. Par's practice "fail."

**REDACTED**

**REDACTED** but also in furtherance of the avowed vengeful plan to see Dr. Par "fail" did the following:

- As current and former Wolfe Clinic staff and employees will testify, the Individual Defendant Doctors sternly ordered staff and employees not to tell any inquiring patients any information concerning Dr. Par, including that he was still practicing or where he was still practicing, and instead lied to these patients and tell them that they did not know where Dr. Par was at.

- Another variation of this scheme was to falsely inform patients that Dr. Par was "not available."  That, too, was a lie, in that **REDACTED** **REDACTED** Dr. Par was available to treat them.

101.    By way of example, **REDACTED** **REDACTED**

- Patient 1 went to Wolfe Clinic in December 2020 and was told that Wolfe Clinic had no idea where Dr. Par had gone.

- Patient 2 asked several people in the Spencer clinic where Dr. Par was and no one gave her any information. When she called to cancel an appointment, she was asked why and who she was going to see.

- Patient 3 saw Dr. Par once and seemed excited about his treatment, but then later inexplicably reported that he was concerned that Dr. Par was not in his town fulltime. Yet he knew that before being seen by Dr. Par. Upon further discussion, he stated that someone at the clinic convinced him that Wolfe Clinic is safer if he has an emergency.

- Patients 4 and 5 asked staff at Wolfe Clinic where Dr. Par was, and staff refused to say.

- Patient 6 said staff at Wolfe Clinic was deceptive and made it very difficult to find Dr. Par.

- Patient 7 asked Dr. Nielsen about what happened and why Dr. Par was no longer at Wolfe Clinic.  Dr. Nielsen told him that Dr. Par had ten fewer years training than he did.

- Patients 8, 9, 10, and 11 were falsely told that Dr. Par's treatment of them was beneath the standard of care.

- A number of patients have requested that Wolfe Clinic send their medical records to Dr. Par, but those records either have not been sent or have been inordinately delayed.

Given all of the methods that Wolfe Clinic has undertaken to undermine Dr. Par's right to practice, it is logical and reasonable to infer that many more patients have been discouraged from using his services than those who have actually reported to him.

102.     When patients learned that Dr. Par was still practicing medicine, Wolfe Clinic implemented a plan to interfere with their wish to be seen by Dr. Par, and to maintain Wolfe Clinic's market share.

103.     To prevent Dr. Par from seeing these patients, Wolfe Clinic staff were instructed to follow a prepared written script when patients called to cancel their appointment with Wolfe Clinic.

104.     The script, much like the letter, was designed to highlight Wolfe's resources, and suggest that such resources were not available to Dr. Par.  The script stated: "As you know, it is very important to stay on top of your retina condition.  At Wolfe, we have specially trained retina doctors who treat your condition.  We also have specialists in other areas of eye care who are available to you for any other potential eye needs you may have."

105.     REDACTED                                                                          if patients still asked to see Dr. Par, the prepared script also provided staff with a convincing plea that these patients reconsider seeing Dr. Par.

106.     The script was designed to REDACTED                        by implying that Wolfe Clinic was the better choice for patients rather than advising them that Dr. Par had established his own practice.

107.     The Wolfe Clinic elected to intentionally not tell Dr. Par's patients that he was no longer there and to have another retina surgeon see those patients when they showed up for their appointment with Dr. Par.

108.     Multiple patients have confirmed that even after they had personally cancelled their appointments with Wolfe Clinic in order to see Dr. Par, they would continue to get reminder calls from Wolfe Clinic.

109.     Wolfe Clinic's deliberate plan to lie to patients who requested information on Dr. Par and their denigrating February 2021 letter, and the script to undermine patients' confidence in Dr. Par and divert them back to Wolfe Clinic, constitutes tortious interference of the business relationship and/or prospective economic advantage Dr. Par had with his patients.  These patients are calling Wolfe Clinic specifically to continue their care with Dr. Par.  Wolfe Clinic clearly intended to hinder their ability to do so and to discourage them from being treated by Dr. Par.

110.     Given its calculated and protracted nature, it is logical that many patients succumbed to Wolfe Clinic's scheme and did not contact Dr. Par.  The refusal to provide the truth concerning Dr. Par's whereabouts and the misinformation provided by Wolfe Clinic was not only deliberately deceptive, but it also was foreseeable that it would cast Dr. Par in a very bad light. The letter implied that Dr. Par had done something wrong and/or that there was some reason why Wolfe Clinic was not willing to freely provide the standard professional courtesy of putting inquiring patients in contact with him.

111.     On February 8, 2021, shortly after Dr. Par left the Clinic, there was a major data breach at Wolfe Clinic that exposed patient information.  The records of approximately 500,000 patients may have been compromised, including names, mailing address, dates of birth, Social Security numbers, and protected health information.

112.     Neither Dr. Par's nor Wolfe Clinic's patients were informed of this data breach for approximately four months.  Then, the Clinic sent letters to the large number of potentially affected customers.  News of the data breach was also widely reported by local news outlets across Iowa.  Although the data breach occurred after Dr. Par left Wolfe Clinic, both a staff member and physician informed Dr. Par that Dr. Nielsen had been communicating to non-shareholder staff and employees that Dr. Par was responsible for it.

113.    As part of its scheme to undermine Dr. Par's professional reputation and prevent him from developing a successful medical practice, Wolfe Clinic made numerous REDACTED REDACTED statements to outside persons, including doctors and staff, and persons employed at Wolfe Clinic, that Dr. Par's care of his patients fell below the standard of care; that he had a disruptive personality; and that he had done something illegal.  These include the following examples:

- Dr. Nielsen told his nurses that "at some point the police will be over at Dr. Par's new office."  According to a former Wolfe Clinic nurse who heard this comment, it was "said in a very serious tone and gave the impression that Dr. Par was guilty of serious wrongdoing."

- Dr. Nielsen told his nurses that if Dr. Par's nurses have anything to do with his new practice "that they could get in trouble or be called into court."

- Dr. Saggau met with Spencer staff about "not allowing some New Yorker to come and take over Fort Dodge eyecare."  He said a number of disparaging things about Dr. Par.

- One of Dr. Par's Pleasant Hill patients had previously been prescribed an anti-anxiety medication by Dr. Par to use prior to her injections.  Dr. Nielsen told his nursing team this was "unnecessary" and "absurd," making it sound as though Dr. Par had wrongly or unnecessarily prescribed medication.

- Dr. Saggau spoke with Dr. Kyler (a referring optometrist) about a mutual patient who continued care with Dr. Par.  Dr. Saggau falsely told Dr. Kyler that Dr. Par had misdiagnosed her.

- Dr. Nielsen falsely told employees, Wolfe Clinic optometrists (who are possible referral sources), as well as Dr. Ian Thompson, that Dr. Par had many chances to redeem himself but refused to cooperate.

**G.    Defendants Intentionally Decimate Dr. Par's Referral Network to Retain Their Dominance in the Des Moines, Ft. Dodge, and Spencer Vitreoretinal Care Markets.**

114.    Referrals from other doctors traditionally serve as an important source of new patients for retina surgeons, and Dr. Par in the preceding four years had established many referral relationships from which he routinely received referrals. Despite the satisfactory referral relationships and his superior clinical practice, these referrals abruptly stopped once he started his own practice.

115.    Dr. Par reasonably anticipated that when he opened a practice, he would receive at least some referrals from Huseman Eye Care, whose optometrists and staff he was on good terms with and whom had spoken favorably of him. Since opening, Dr. Par has not received any referrals from Huseman Eye Care. On information and belief, Wolfe Clinic has received dozens of referrals from several optometrists at the clinic who used to refer their patients to him.

116.    Dr. Par was on good terms with the providers and staff at a vision clinic in Newton, Iowa, from whom he reasonably expected to receive many referrals. Based on this reasonable expectation and representations from the clinic, Dr. Par intended to open a Newton office. Dr. Par intended to become the first and only retinal surgeon to see patients in Newton and this was initially met with enthusiasm from a doctor in this group who worked to set up a dinner meeting with his partners and Dr. Par. But the senior partner of the Newton vision group emailed Dr. Par and stated that it had a longstanding relationship with Wolfe Eye Clinic. On information and belief, this group refers well over 200 patients a year to Wolfe Eye Clinic. It has not referred any patients to Dr. Par since he established his own practice.

117.    When Dr. Par opened his practice, an optometrist in Clarke County indicated he was interested in having Dr. Par see patients in his clinic.  The optometrist suddenly ceased contact with Dr. Par for no apparent reason.  That optometrist has sent Wolfe Clinic over 200 patients.

118.    A doctor in Ft. Dodge said that he would send Dr. Par patients from Ft. Dodge, and suggested, on more than one occasion, that he would orchestrate a talk by Dr. Par to the local optometrist society.  The doctor abruptly stopped communicating with Dr. Par.

119.    Similarly, an optometrist who had approached Dr. Par to open a practice with him in Ankeny abruptly stopped responding to emails, texts, or phone calls. His group had initially sent a handful of patients to PAR Retina.  No referrals have been sent since he stopped communicating.

120.    Dr. Par had similar experiences with other practices.  He sought to partner with a retinal physician in Sioux City, Iowa who was initially quite interested in building a relationship but abruptly cancelled their in-person meeting/interview after speaking with Dr. Nielsen of Wolfe Clinic.

121.    Dr. Par also reached out to a large, well-respected multi-specialty group with offices in Nebraska, South Dakota, North Dakota, Minneapolis and Montana.  This group did not have an office in Iowa.  Dr. Par had productive conversations with their CEO who then abruptly stopped responding in late January 2021 after communicating with Wolfe Clinic physicians.

122.    Other referral physicians who were highly satisfied with Dr. Par have no longer referred patients to him, and many now refuse to even communicate with him.

123.    The disparaging information that defendants spread had nothing to do with his quality of care and everything to do with their desire to shut Dr. Par out of the market.

124.    In addition to the disparaging information Wolfe Clinic and its shareholders distributed about Dr. Par, Wolfe Clinic employs numerous other anticompetitive practices to ensure that optometrists and other referral sources do not refer patients to Dr. Par but continue to refer patients to Wolfe Clinic rather than Dr. Par or any other potential competitor.

125.    Wolfe Clinic has indicated to referral sources that should they refer patients to Dr. Par, those patients may be unable to easily access Wolfe Clinic facilities or physicians in emergencies, or for procedures that Dr. Par, as a retina surgeon, does not perform.

126.    Wolfe Clinic cultivates relationships with rural hospitals to ensure that competitors do not get toeholds in rural communities.  Several hospital administrators, who were initially interested in renting space to Dr. Par, ultimately refused to do so, indicating their relationship with Wolfe Clinic would be jeopardized if they did so.

127.    To protect and enlarge its market share, Wolfe Clinic has acquired optometry clinics in communities for the express purpose of referring lucrative surgical work to its cataract and retinal surgeons, even if it must operate the clinics at a loss or for little to no profit.

128.    By acquiring optometry clinics, the Wolfe Clinic has locked-in a significant share of referrals to retina surgeons.  This makes it very difficult for new retina surgeons to enter the market.

**H.    Wolfe Clinic's anticompetitive and exclusionary practices prevent Dr. Par from operating a successful practice and compromises patient care.**

129.    Wolfe Clinic's scheme to harm Dr. Par and his practice REDACTED REDACTED was contrary to patients' rights and interests.  When Dr. Par left the Clinic, REDACTED Wolfe Clinic did not hire an immediate replacement. REDACTED this left the clinic unable to fulfill the needs of all its patients.

130.    The Defendants also knew, or should have known, that their plan to deprive Dr. Par from treating all or a significant portion of his patients would result in longer wait times for appointments, and less time for the doctors to spend in consultation, diagnosis, and treatment.

131.    As part of their plan to make Dr. Par "fail" after he left, and as a consequence of denying patient access to him, each retina surgeon began seeing approximately 90 patients a day when they had previously been seeing 50 patients each day.  The Clinic tried, at all costs, to retain patients, despite not having the resources to treat them.  On information and belief, the redetachment rate and endophthalmitis rates increased in Dr. Par's absence.  Nurse and ancillary staff member turnover peaked in the months that ensued, with more care being delivered by unsupervised trainees.  And congregation in waiting areas increased, which in turn increased risk of contracting COVID while waiting for their appointments at Wolfe Clinic.  In sum, Wolfe Clinic and the Individual Defendant Doctors wrongfully and unnecessarily compromised patient care in order to see Dr. Par's practice fail, and to maintain their monopoly over vitreoretinal care in Des Moines, Ft. Dodge, and Spencer.

132.    Iowa Administrative Code Rule 653-13.20 provides: "A physician should not provide medical services under terms or conditions which tend to interfere with or impair the free and complete exercise of the physician's medical judgment and skill or tend to cause a deterioration of the quality of medical care."

133.    Iowa Administrative Code Rule provides 653-13.7 provides: "A physician shall not engage in disruptive behavior. Disruptive behavior is defined as a pattern of contentious, threatening, or intractable behavior that interferes with, or has the potential to interfere with, patient care."

134.     Under the circumstances, Defendants' attempt to drive Dr. Par from the marketplace and maintain Wolfe Clinic's dominant market share was disruptive and contentious. Defendants' behavior strained the Clinic' resources such that required standards of patient care would foreseeably become and were actually compromised.  For example, one of Dr. Par's patients who went to Wolfe Clinic following Dr. Par's departure reported that the Clinic was extending certain injections he was receiving.  While this should be done gradually so as not to compromise a patient's vision, the patient reported that Wolfe Clinic "extended my injections like crazy, and my vision has suffered and that's why I'm here."  This was a common complaint among patients seeing Dr. Par at his new clinic.  Wolfe Clinic could not adequately treat the volume of patients it received who needed retinal care, but its exclusionary practices were designed to prevent other retina surgeons from entering the market, and to drive competitors, like Dr. Par, from the market.

I.     **The Geographic and Product Markets.**

135.     Des Moines, Ft. Dodge, and Spencer are each proper geographic markets. Patients prefer to stay in their respective cities to receive care.  Patients in Ft. Dodge do not wish to travel to Des Moines to receive care.  Patients in Spencer do not wish to travel to Sioux City, Sioux Falls, or Minneapolis to receive care.  Patients in Des Moines do not wish to travel to Omaha or elsewhere to receive care.

136.     Many retina patients are elderly or infirm and relatively immobile.  They are unable to easily drive from Spencer, Des Moines, or Ft. Dodge, to visit a substitute provider in Omaha, Sioux City, Sioux Falls, or elsewhere.

137.     Often retina patients must depend on a family member or other caregiver with limited time to drive them to their appointments and procedures, or attend appointments with

them in order to hear instructions.  These caregivers have limited time and are unable to travel long distances to appointments.

138.    Additionally, many patients receiving retina care require multiple appointments during the year, making the burden of travel that much greater.

139.    Retinal patients often require immediate care and may not be able to take unscheduled trips out of town to receive it, particularly if they are dependent on a caregiver to drive them.

140.    An overwhelming number of retina patients in Des Moines live in the Des Moines area, in Spencer live near Spencer, and in Ft. Dodge live near Ft. Dodge.

141.    Generally, retina surgeons do not wish to uproot themselves and their families to move their practice or travel long distances for work.  Healthcare is local, and once a doctor has an established patient base it is difficult to leave one city and build a new practice in another location.  In moving, doctors may also lose access to their referral network, and must work to rebuild one from scratch.  Thus, the proper geographic market for healthcare services is local.  In this case, there are three relevant geographic markets: Des Moines, Ft. Dodge, and Spencer.

142.    In the alternative, Central Iowa constitutes a proper geographic market.  Central Iowa consists of the middle third of the state.  It is bordered on the South by Missouri and on the North by Minnesota.  It includes Lamoni, Chariton, Pella, Ottumwa, Des Moines, Ames, Boone, Winterset, Ft. Dodge, Iowa Falls, Webster City, and Charles City, among other cities.

143.    These cities comprise the primary and secondary service areas for Wolfe Clinic and its direct competitors.  Central Iowa is a proper geographic market because healthcare providers compete for patients located in the area, healthcare providers prefer to practice locally in the area rather than move their practice, and payors require providers in Central Iowa.

144.     Vitreoretinal care is a relevant product market.  Vitrectomy surgery and injections are used to repair diseases that primarily affect the back of the eye, including the retina, vitreous, and macula.  In some cases, such are is necessary to repair a patient's vision, or ensure that they do not lose their vision.  Vitrectomy surgery requires the removal of a liquid gel called the vitreous, which is located in the back of the eye.  This type of surgery requires work on delicate tissue in a small area, often using microscopes and lasers.  Retina surgeons with years of specialized training perform surgeries and in-office sight saving procedures.  Ophthalmologists or other doctors or surgeons who are not trained retinal surgeons are not adequate substitutes for retinal surgeons.

## J.     Wolfe Clinic is a Monopolist.

145.     Wolfe Clinic is a monopolist in the Des Moines, Ft. Dodge, and Spencer markets.  Its ability to maintain high market share while offering substandard patient care demonstrates it is a monopolist.

146.     Wolfe Clinic has a substantial share of the retina surgery market that meets or exceeds approximately 70% in Des Moines, and approaches 100% in Ft. Dodge and Spencer.  Its market share is high enough to raise a presumption of monopoly power.

147.     There is no substitute for vitreoretinal care, a specialized field of medicine that requires injections or surgery performed by a specialized doctor trained to provide such treatment.

148.     Wolfe Clinic owns numerous Wolfe vision centers.  Each vision center has an optometrist.  The Wolfe Clinic optometrists provide an extensive network of virtually automatic referrals.  On information and belief, these optometrists are provided higher compensation than

they would otherwise be provided so that Wolfe Clinic can obtain referrals from these optometrists.

149.    There are high barriers to entry in the vitreoretinal care market.  The supply of highly trained retinal surgeons is limited because of the years of education and training required to become a retinal surgeon.  Once they have established practices, surgeons typically do not wish to move to other geographic areas.

150.    To open an independent clinic, a physician must invest significant capital.

151.    Referral networks tend to be well-established.  Thus, it is difficult for retinal surgeons opening new practices to quickly cultivate potential referral sources, as many optometrists already refer their patients to certain providers.

152.    High barriers to entry and Wolfe Clinic's control over referral sources limit the ability of any independent retina surgeon to enter Des Moines, Ft. Dodge, and Spencer.  Because of the difficulty in competing against a monopolist, Dr. Par was the first independent retina surgeon to enter the geographic markets of Ft. Dodge, Spencer, and Des Moines in many years.

**K.    Wolfe Clinic uses exclusionary practices to maintain its monopoly.**

153.    Wolfe Clinic has used exclusionary practices to maintain its monopoly over retina surgery in the Des Moines, Ft. Dodge, and Spencer markets.

154.    Wolfe Clinic has strategically acquired optometry practices to exercise control over potential referrals and prevent referrals to retinal surgeons who are not part of the Wolfe Clinic.

155.    By doing so, Wolfe Clinic has achieved huge returns for its retina surgeons. Despite Des Moines's small market size, retina surgeons at Wolfe Clinic are among the highest earning retina surgeons in the nation.

156.    Des Moines based Iowa Retina competed or attempted to compete with Wolfe Clinic in certain markets for years, but Wolfe Clinic, through its unfair and anticompetitive practices, has worked to drive Iowa Retina from certain markets.

157.    Recently, Wolfe Clinic purchased one of the two optometry practices in Creston, Iowa, a town of 8,000 that is a regional center for Southwest Iowa.  By acquiring this practice, Wolfe Clinic has ensured that it alone would receive the many referrals to retina surgeons generated by this practice, and that Iowa Retina would receive none.

158.    Wolfe Clinic also recently purchased St. Anthony Eye Clinic in Carroll, Iowa, another regional center, where Dr. Kiessling, a cataract surgeon, used to practice.  Iowa Retina would use her office to see patients.  That space is no longer available for Iowa Retina, or anyone other than Wolfe Clinic, to use, meaning patients who wish to remain in Carroll for retina surgery have little choice but to see a Wolfe Clinic retina surgeon.

159.    For many years, no retina surgeon, other than Dr. Par, has entered the vitreoretinal care market in Des Moines, Ft. Dodge, Spencer.

160.    Wolfe Clinic has targeted Dr. Par because he is the only independent retina surgeon in Ft. Dodge and Spencer, and the only independent retinal surgeon in Des Moines, Iowa.

161.    Wolfe Clinic responded to Dr. Par's opening of an independent practice with a systematic and targeted scheme to exclude him from the market by ruining his reputation, eliminating referrals and potential referrals to him, concealing his whereabouts from former patients of his, and making him "fail."

162.    Defendants' anticompetitive scheme included providing instructions to staff that they were to falsely advise inquiring patients that they did not know Dr. Par's whereabouts.

163.   Defendants' anticompetitive scheme included deliberately failing to tell patients that Dr. Par is still practicing and where his new practice is located, REDACTED

REDACTED

164.   Defendants' anticompetitive scheme included communicating defamatory statements about Dr. Par to its staff and patients.

165.   Defendants' anticompetitive scheme included drafting and instructing staff to use a written script to mislead patients who asked about Dr. Par and to dissuade them from being treated by Dr. Par.

166.   Defendants' anticompetitive scheme included contacting referring optometrists and physicians and discouraging them from either continuing or establishing a referral relationship with Dr. Par.

167.   Defendants' anticompetitive scheme included the continued acquisition of small optometry practices.

168.   On information and belief, Defendants' anticompetitive scheme included threatening referring physicians that unless they referred their patients to Wolfe Clinic, those patients would not receive priority should they need a Wolfe Clinic doctor in the event of an emergency.

**COUNT I**
**(Monopolization and Attempted Monopolization**
**in Violation of Sherman Act § 2**
**and Iowa Code  553.5)**
**Against Wolfe Clinic**

169.   Plaintiffs restate paragraphs 1 through 168 of the Complaint as though fully set forth herein.

170.    Plaintiffs are entitled to relief for Wolfe Clinic's federal antitrust violations pursuant to Clayton Act §§ 4 and 16, which permit a private individual to sue for damages and injunctive relief.

171.    Plaintiffs are entitled to relief for Wolfe Clinic's state antitrust violations pursuant to Iowa Code § 553.11, which creates a private right of action for those harmed by antitrust violations.

172.    The relevant product market is vitreoretinal care.

173.    There are three relevant geographic markets: Des Moines, Ft. Dodge, and Spencer.  In the alternative, Central Iowa consists of a single geographic market that encompasses Des Moines and Ft. Dodge, among other cities.

174.    Defendant Wolfe Clinic has monopoly power in Des Moines, Ft. Dodge and Spencer in the vitreoretinal care market.

175.    Defendants have acquired, maintained, and enhanced their monopoly power in the provision vitreoretinal care through the use of exclusionary conduct rather than through superior service, business acumen, or historic accident.  The antitrust violation at issue is Wolfe Clinic's maintenance and attempted maintenance of its monopoly power through defamatory and false and misleading statements to existing and prospective patients and referral sources, and its acquisition of local optometry clinics at above market prices—which operate at little or no profit—for the purpose of maintaining control over potential referral sources.

176.    Defendant Wolfe Clinic has also attempted to maintain its market power through a systematic and targeted scheme to ruin Dr. Par's reputation and practice, eliminate referrals and potential referrals to him, conceal his whereabouts from former patients of his, and make him "fail."

177.     There is no legitimate or pro-competitive explanation for Wolfe Clinic's conduct.

178.     Defendants' conduct has reduced access to care and lowered the quality of care for patients in the Des Moines, Ft. Dodge, and Spencer markets, leading to longer waits for appointment times, longer time spent in the waiting room, and less attention to patient needs.

179.     Dr. Par and Par Retina have suffered injury-in-fact, and Defendants' antitrust violations were a material and substantial cause of Dr. Par's and Par Retina's injury.

180.     Wolfe Clinic has deprived Dr. Par of patients and eliminated existing and potential referral sources, making it difficult if not impossible to sustain a practice in Des Moines, Spencer, and Ft. Dodge, Iowa.

181.      Dr. Par and Par Retina have suffered antitrust injury and damages in the form of lost revenue and lost referrals.

**COUNT II**



**Against All Defendants**

182.     Plaintiffs restate paragraphs 1 through 181 of the Complaint as though fully set forth herein.



188.    Instead, staff has been advised to falsely inform patients that Dr. Par is "not available."

REDACTED

190.    Defendants' conduct was willful, wanton, and malicious, and was done with disregard for Dr. Par's rights.

**COUNT III**

REDACTED

**Against All Defendants**

191.    Plaintiffs restate paragraphs 1 through 190 of the Complaint as though fully set forth herein.

REDACTED



198.    Defendants' conduct was willful, wanton, and malicious, and was done with

disregard for Dr. Par's rights.

<u>**COUNT IV**</u>
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**
**Against All Defendants**

199.    Plaintiffs restate paragraphs 1 through 198 of the Complaint as though fully set

forth herein.



205.    Defendants' conduct was willful, wanton, and malicious, and was done with

disregard for Dr. Par's rights.

**COUNT V**
**(Defamation Per Se)**
**Against All Defendants**

206.    Plaintiffs restate paragraphs 1 through 205 of the Complaint as though fully set

forth herein.

207.    Defendants made defamatory statements to third parties, including patients,

healthcare providers, and Wolfe Clinic staff about Dr. Par, his ability as a doctor, and his

character.

208.    These statements concerned Dr. Par's professional acumen and judgment, the nature and quality of current and past treatments he provided to patients, whether certain tests or treatments he prescribed were necessary, and whether he had engaged in criminal activity.

209.    Statements that Dr. Par engaged in criminal activity are slanderous per se.

210.    Statements that implicated Dr. Par's professional competence are slanderous per se.

211.    Defendants' statements harmed Dr. Par, causing him significant financial loss.

212.    Defendants' conduct was willful, wanton, and malicious, and was done with disregard for the rights of Dr. Par.

### COUNT VI
### (Defamation By Omission)
### Against All Defendants

213.    Plaintiffs restate paragraphs 1 through 212 of the Complaint as though fully set forth herein.

214.    By failing to inform patients that Dr. Par was still practicing medicine in the area, Defendants they wrongfully implied that Dr. Par left under adverse circumstances related to his character, commitment to his Iowa patients, and professional aptitude.

215.    The Wolfe Clinic's February 8, 2021 letter to patients falsely implied that separating from Dr. Par was necessary for the good of the clinic and its patients.  Patients who read the deliberately-worded and misleading letter would have believed Dr. Par was no longer practicing locally, and thus continuing treatment with him was not an option.

216.    The Wolfe Clinic's letter also falsely implied, by omission, that Dr. Par should not have had patient contact information in his possession, suggesting that if he had contacted his patients, he did so using information he had stolen from Wolfe Clinic.

217.    The Wolfe Clinic's instructions to staff that they were not to inform patients that Dr. Par was practicing locally also falsely implied that Dr. Par had abandoned his patients, given up the practice of medicine, left the area, or lost his medical license.

218.    These omissions were malicious and intended to drive Dr. Par out of the State of Iowa, even though the State needed additional retina surgeons.

219.    These omissions also caused Dr. Par to lose former and prospective patients, causing him and his practice significant financial loss.

220.    Defendants' conduct was willful, wanton, and malicious, and was done with disregard for Dr. Par's rights.

## COUNT VII
### (False Light)
### Against All Defendants

221.    Plaintiffs restate paragraphs 1 through 220 of the Complaint as though fully set forth herein.

222.    The Wolfe Clinic sent correspondence to Dr. Par's patients, a substantial number of people.  The letter placed Dr. Par in a false light before the public, suggesting that Dr. Par's separation was for the good of Wolfe Clinic and its patients.

223.    Defendants made false representations to those in the medical community about Dr. Par's skill as a doctor, and his professional judgment.

224.    Defendants acted in knowing or reckless disregard as to the falsity of its statements, and the false light in which the statements would place Dr. Par.

225.    Plaintiffs were damaged by the Wolfe Clinic in an amount to be determined at trial.

226.    Defendants' conduct was willful, wanton, and malicious, and was done with disregard for the rights of Dr. Par.

## COUNT VIII
### (Intentional Interference with Contract)
### Against All Defendants

227.    Plaintiffs restate paragraphs 1 through 226 of the Complaint as though fully set forth herein.

228.    Given the rapport he had with his patients and how he approached their care and treatment, the Wolfe Clinic and Individual Defendant Doctors knew that if Dr. Par's patients learned he had opened a clinic in Iowa, these patients would choose to continue to receive their care from Dr. Par, not from Wolfe Clinic.

229.    Defendants' actions to interfere with Dr. Par's patient relationships, to lie to patients who requested information on Dr. Par, to send a denigrating February 2021 letter, and to use a script to undermine patients' confidence in Dr. Par and divert them back to Wolfe Clinic were intentional, improper, and designed to drive Dr. Par from the State of Iowa by denying him his existing patients, even though there was a shortage of retina surgeons in Iowa.

230.    Defendants' actions to spread verifiably false and defamatory statements to interfere with Dr. Par's referral network of medical professionals was intentional and improper, and designed to destroy his existing referral network.

231.    Defendants' intentional and improper interference caused Dr. Par to lose a substantial number of patients and has harmed him and his practice financially in an amount to be determined at trial.

232.    Defendants' conduct was willful, wanton, and malicious, and was done with disregard for the rights of Dr. Par.

**COUNT IX**
**(Intentional Interference with Business Relations)**
**Against All Defendants**

233.    Plaintiffs restate paragraphs 1 through 232 of the Complaint as though fully set forth herein.

234.    Defendants knew that Dr. Par received referrals from doctors across the State of Iowa, and knew his most common sources of referrals.

235.    Defendants undertook a campaign to convince these referral sources that Dr. Par had poor professional judgment and was not to be trusted.

236.    Defendants' actions to spread verifiably false and defamatory statements to interfere with Dr. Par's referral network of medical professionals, and to discourage others from making referrals to Dr. Par, were designed to destroy Dr. Par's referral network, thereby denying him patients.

237.    Defendants' actions to lie to patients who requested information on Dr. Par, their denigrating February 2021 letter, and the script to undermine patients' confidence in Dr. Par and divert them back to Wolfe Clinic were intentional and improper, and designed to drive Dr. Par from the State of Iowa by denying him patients, even though there was a shortage of retina surgeons in Iowa.

238.    Defendants' intentional and improper interference caused Dr. Par to lose a substantial number of prospective patients, and has harmed him and his practice financially in an amount to be determined at trial.

239.    Defendants' conduct was willful, wanton, and malicious, and was done with disregard for the rights of Dr. Par.

**COUNT X**
**(Fraudulent Inducement)**

**Against All Defendants**

240.    Plaintiffs restate paragraphs 1 through 239 of the Complaint as though fully set

forth herein.



## COUNT XI
### (Civil Conspiracy)
### Against All Defendants

249.     Plaintiffs restate paragraphs 1 through 248     of the Complaint as though fully set forth herein.

250.     The Individual Defendant Doctors and the Wolfe Clinic knew that Dr. Par had established a competing clinic, Par Retina, in the Des Moines area, and acted in concert to interfere with that clinic's relationship with current and prospective patients, and to impugn Dr. Par's character and competence in the community.

251.     The Individual Defendant Doctors and the Wolfe Clinic intended that the Wolfe Clinic interfere with Par Retina's and Dr. Par's relationship with current and prospective patients.

252.     The Individual Defendant Doctors and the Wolfe Clinic intended to defame Dr. Par to referring physicians and Dr. Par's current and prospective patients.

253.     The Individual Defendant Doctors and the Wolfe Clinic intended, through their tortious conduct, to drive Dr. Par out of business so that they could continue to dominate the vitreoretinal care market.

254.     The Individual Defendant Doctors and the Wolfe Clinic acted, encouraged actions, and assisted in actions in furtherance of this tortious conduct.

255.     The Individual Defendant Doctors and the Wolfe Clinic have acted and continue to act in wanton disregard of Dr. Par's rights.

## COUNT XII
### (Rescission)
### Against All Defendants

256.    Plaintiffs restate paragraphs 1 through 255 of the Complaint as though fully set

forth herein.



**COUNT XIII**
**(Punitive Damages)**
**Against All Defendants**

264.     Plaintiffs restate paragraphs 1 through 263 of the Complaint as though fully set forth herein.

265.     Defendants initiated a campaign to destroy Dr. Par's reputation among medical professionals and the general public and make it impossible for him to practice medicine in the State of Iowa.

266.     Defendants' conduct was willful, wanton, and malicious, and was done to destroy his clinic, with total disregard for the rights of Dr. Par.

267.     Plaintiffs should be awarded punitive damages to punish Wolfe Clinic and the Individual Defendant Doctors for its conduct and deter it from acting tortiously in order to prevent competition in the State of Iowa.

**Prayer for Relief**

WHEREFORE, Plaintiffs respectfully request that the Court:

1.     Award Plaintiffs compensatory damages in an amount to be determined at trial.

2.     Award Plaintiffs punitive damages in an amount to be determined at trial.

3.     Award Plaintiffs damages for reputational harm.

4.     Award Plaintiffs exemplary damages under Iowa Code § 553.12 of twice the actual damages incurred as a result of Defendants' exclusionary practices and under Section 4 of the Clayton Act of three times the actual damages incurred as a result of Defendants' exclusionary practices.

5.     Award Plaintiffs attorneys' fees to the extent authorized by law, including federal and state antitrust statutes.

REDACTED

# REDACTED

8.    Award such other relief as the Court deems just and proper.

**<u>Jury Demand</u>**

Plaintiffs demand a jury on all issues so triable.

October 1, 2021

*/s/ Angel West*

Angel West, AT0008416
MAYNARD COOPER & GALE
9313 Huntington Cir.
Johnston, Iowa 50131
Telephone: (515) 686-8223
Facsimile: (205) 254-1999
awest@maynardcooper.com

Carl Burkhalter (Pro Se Application
forthcoming)
MAYNARD, COOPER & GALE, P.C.
1901 Sixth Avenue North
Suite 1700
Birmingham, AL 35203
T: (205) 254-1000
F: (205) 254-1999
cburkhalter@maynardcooper.com

Thomas C. Goodhue, AT0013533
MAYNARD COOPER & GALE
8123 Hadfield
Johnston, Iowa 50131
Telephone: (202) 660-2319
Facsimile: (205) 254-1999
tgoodhue@maynardcooper.com
