IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| GEORGE PAR, and IVYR PLLC d/b/a PAR RETINA, <br><br>       Plaintiffs, <br><br> v. <br><br> WOLFE CLINIC, P.C., JARED S. NIELSEN, KYLE J. ALLIMAN, and DAVID D. SAGGAU, <br><br>       Defendants. | **No. 4:21-cv-00290-RGE-SBJ** <br><br> **ORDER GRANTING DEFENDANTS' PARTIAL MOTION TO DISMISS AND REMANDING REMAINING CLAIMS** <br><br> **FILED UNDER SEAL** |

## I. INTRODUCTION

Plaintiff George Par and his vitreoretinal care business Plaintiff IVYR PLLC, doing business as Par Retina, sue his former employer Defendant Wolfe Clinic, P.C., and his former colleagues Defendants Jared S. Nielsen, Kyle J. Alliman, and David D. Saggau. Plaintiffs allege claims for antitrust violations under Iowa and federal law, and contract, tort, and civil conspiracy claims under Iowa law. Plaintiffs' claims arise from disputes surrounding the termination of Par's employment from Wolfe Clinic and related mediation. Defendants move to dismiss Plaintiffs' antitrust claims, and aspects of Plaintiffs' contract, civil conspiracy, and tort claims under Iowa law. Plaintiffs resist. For the reasons set forth below, the Court grants Defendants' motion and remands the remaining state law claims to the Iowa District Court for Polk County.

## II. BACKGROUND

The Court accepts the facts alleged in the complaint as true for the purpose of considering Defendants' motion to dismiss. *See Brown v. Medtronic, Inc.*, 628 F.3d 451, 459 (8th Cir. 2010).

### A. The Parties

Par is a former employee of Wolfe Clinic, where he worked as an ophthalmologist

specializing in vitreoretinal surgery. Sealed Compl. ¶¶ 8, 10, 19, ECF No. 4. Wolfe Clinic is an Iowa corporation providing vitreoretinal care across the state, including in Des Moines, Fort Dodge, and Spencer. *See id.* ¶¶ 1, 14. Nielsen, Alliman, and Saggau are ophthalmologists, shareholders, and members of the Board of Directors at Wolfe Clinic. *Id.* ¶¶ 15–17.

Vitreoretinal care pertains to the management of conditions at the back of the eye requiring surgery, including retinal detachment, ocular trauma, complicated diabetic eye disease, macular degeneration, and complications of cataract surgery. *Id.* ¶ 8. Par alleges Wolfe Clinic controls "approximately 70% of the Des Moines vitreoretinal care market, and nearly 100% of the vitreoretinal care[ ]market in Spencer and Ft. Dodge." *Id.* ¶ 19. In 2020, Wolfe Clinic terminated Par's employment after the parties' relationship deteriorated. *See id.* ¶¶ 20–23. After his termination, Par founded Par Retina in Clive, Iowa. *Id.* ¶ 11. Par provides vitreoretinal services in Des Moines, Fort Dodge, and Spencer, Iowa. *See id.* ¶¶ 12, 159–60.

### B.    Mediation and Settlement Agreement

The parties engaged in mediation to settle the disputes arising from Par's termination. *See id.* ¶¶ 25, 79–88. Plaintiffs allege that during the mediation, "Wolfe Clinic fraudulently told . . . Par that it had not discouraged key referring optometrists from referring patients to him." *Id.* ¶ 27. Plaintiffs also allege, "Wolfe Clinic . . . failed to tell . . . Par it had contacted potential out-of-state employers and made disparaging comments, such as [he] was disruptive at Wolfe Clinic." *Id.* Plaintiffs allege "[d]uring the mediation, Wolfe Clinic's legal counsel assured . . . Par and his counsel that no such communications had occurred." *Id.* Plaintiffs later learned "Dr. Saggau, Dr. Fox, and CEO Tom Hurney [of Wolfe Clinic] . . . communicate[d] with optometrists in northwest Iowa," despite Wolfe Clinic's attorney's assurance they had not. *Id.* ¶¶ 82.

The parties entered into a Settlement Agreement. *See id.* ¶¶ 27–29; Pls.' Sealed Ex. 1 Supp. Compl., ECF No. 4-1 (Settlement Agreement). The Settlement Agreement contains a choice of

law clause designating "the laws of the State of Iowa" shall govern. ECF No. 4-1 ¶ 10.b. The

Settlement Agreement also contains an anti-reliance clause, which states:

> In making this Agreement, the Parties have relied on their own judgment, belief, knowledge, and the information available to them, including information and advice from their legal counsel, at the time of the execution of this Agreement. Other than as expressly set forth herein, the Parties make this Agreement without reliance upon any statement or representation, or the absence of any statement or representation, of any other Party. The Parties acknowledge that under various sources of law, they may have, or may have had, the right to demand from each other the disclosure or production of certain types of information. In making this Agreement, the Parties waive all such rights and entitlements to information, whatever the source, and so knowingly and intentionally waive and relinquish any right to claim or assert that they or any of them was induced to enter into this Agreement fraudulently or by any other unfair or unlawful means.

*Id.* ¶ 6. In addition, the Settlement Agreement contains an integration clause, which states:

> This Agreement constitutes the entire agreement between and among the Parties pertaining to the subject matter of this Agreement. This Agreement supersedes all prior and contemporaneous negotiations, discussions, communications, term sheets, or understandings between the parties and/or their representatives in connection with the subject matter of this Agreement.

*Id.* ¶ 10.a. The Settlement Agreement contains release of liability clauses as to "the Wolfe Parties"

and "Par and Par Retina." *Id.* ¶¶ 1–2. The release of liability as to Plaintiffs states:

> Par and Par Retina . . . forever discharge, and covenant not to sue any of the Wolfe Releasees from all claims, debts, actions, causes of actions, damages, and liabilities, known or unknown, whether at law or in equity arising from the beginning of time to the Effective Date of this Agreement. This release includes, but is not limited to, all claims arising from or related to Par's Threatened Claims, Par's Other Claims, and any of the Wolfe Parties' Threatened Claims including, but not limited to, actions related to Par's employment with any of the Wolfe Parties and/or ownership interests with any of the Wolfe Parties. . . . This release also does not include claims for breach of this Agreement."

*Id.* ¶ 2. Finally, the Settlement Agreement contains a clause regarding separation language, which

states:

> Either party may publicly issue the following statement: "Dr. George Par and Wolfe Eye Clinic, PC have reached an agreement regarding their separation. Dr. Par and Wolfe believe that this agreement is in the best interest of their respective patients and the community. Dr. Par will begin seeing patients on January 1, 2021 at [office

locations]. Wolfe Eye Clinic will continue to serve patients at their existing locations." If inquiries are made relating to the separation of the Parties, the Parties agree to provide only the aforementioned statement and to provide no other information.

*Id.* ¶ 7.

### C.   Defendants' Conduct

Plaintiffs allege Defendants "engaged in a smear campaign to prevent . . . Par from becoming a competitor in the Des Moines, Spencer, and Ft. Dodge vitreoretinal care markets." ECF No. 4 ¶ 26. They allege Defendants defamed Par to prevent his existing patients from seeing him and to "dry up" his referral sources. *Id.* ¶ 1. Plaintiffs allege Defendants "contacted key referring optometrists and discouraged them from continuing any referral relationship with . . . Par by defaming him." *Id.* ¶ 27.

On February 12, 2021, Wolfe Clinic sent a letter to Par's patients stating:

Another change you may already be aware is that as of October 30, 2020, Dr. George Par is no longer seeing patients as [a] physician with Wolfe Clinic and is no longer affiliated with Wolfe Clinic. Wolfe Clinic and Dr. Par have reached an agreement regarding their separation and both partis believe that this agreement is in the best interest of their respective patients and the community. Rest assured, Wolfe Clinic will continue to serve you as our patient at our state-of-the-art existing locations you've come to count on. In addition, we are on call at all our locations 24 hours a day, 7 days a week. When you call to schedule your next appointment, our staff will schedule you to receive [care] from one of our experienced retina specialists.

*Id.* ¶ 89. Plaintiffs allege multiple patients inquired about Par at Wolfe Clinic. *See id.* ¶ 101. In response, Wolfe Clinic's staff "made it very difficult to find . . . Par," lied about his training and expertise, and falsely told patient's his treatment was beneath the standard of care. *See id.* ¶¶ 100–01; *see also id.* ¶¶ 107–08.

Plaintiffs allege Defendants directed Wolfe Clinic staff to "falsely advise inquiring patients that they did not know . . . Par's whereabouts" and "deliberately fail[ed] to tell patients . . . [he was] still practicing." *Id.* ¶¶ 30–31; *see also id.* ¶ 100. They allege Defendants prepared a written

script directing Wolfe Clinic's staff to mislead patients inquiring about Par and dissuade patients from seeking treatment from him. *Id.* ¶ 33. Plaintiffs allege Defendants contacted "current and potential referring optometrists and physicians and discourage[ed] them from . . . continuing or establishing a referral relationship with . . . Par." *Id.* ¶ 34. Plaintiffs allege Defendants also told Wolfe Clinic staff if they cooperated with Par "they would face legal repercussions," and Defendants lied to Wolfe Clinic staff and employees about the circumstances of Par's termination *Id.* ¶¶ 36–38. Plaintiffs allege Defendants' actions impaired patients' rights "to continue their treatment with him and access the doctor of their choice." *Id.* ¶ 39.

Referrals from other doctors are important sources of new patients for vitreoretinal surgeons. *Id.* ¶ 114. Since opening Par Retina, Plaintiffs allege Par has not received referrals from Huseman Eye Center—whose optometrists he was on good terms with—while Wolfe Clinic has received dozens. *See id.* ¶ 115. They also allege a senior partner from a vision clinic in Newton, Iowa, emailed Par explaining the clinic had a longstanding relationship with Wolfe Clinic. *Id.* ¶ 116. Since establishing Par Retina, Par has received no referrals from the vision clinic in Newton, Iowa. *Id.* Other providers in Clarke County, Iowa, Fort Dodge, Iowa, Ankeny, Iowa, and Sioux City, Iowa, have also ceased contact with him. *See id.* ¶¶ 117–20. In January 2021, after having productive conversations with a "large, well-respected multi-specialty group with offices in Nebraska, South Dakota, North Dakota, Minneapolis, and Montana," they stopped discussing a joint venture to open an Iowa clinic with Par after speaking with Wolfe Clinic physicians. *Id.* ¶ 121. Plaintiffs allege Wolfe Clinic has indicated to referral sources that if they refer patients to Par, those patients may be unable to access Wolfe Clinic facilities or physicians in emergencies. *Id.* ¶ 125.

Plaintiffs also allege Wolfe Clinic has "acquired optometry clinics in communities for the express purpose of referring lucrative surgical work to its cataract and retinal surgeons, even if it

must operate the clinics at a loss or for little profit." *Id.* ¶ 127.

Plaintiffs allege "[g]iven its calculated and protracted nature, it is logical that many patients succumbed to Wolfe Clinic's scheme and did not contact Dr. Par." *Id.* ¶ 110. They also allege patient access to care and quality of care in Des Moines, Spencer, and Fort Dodge has suffered as a result of Defendants' actions. *See id.* ¶¶ 39, 130–31, 134. They allege Defendants' "exclusionary practices were designed to prevent other retina surgeons from entering the market, and to drive competitors, like Dr. Par, from the market." *Id.* ¶ 134.

### D.    The Market

Plaintiffs allege Des Moines, Fort Dodge, and Spencer, Iowa, constitute individual geographic markets for vitreoretinal care. *See id.* ¶¶ 135–41. Plaintiffs allege "[a]n overwhelming number of retina patients in Des Moines live in the Des Moines area, in Spencer live near Spencer, and in Ft. Dodge live near Ft. Dodge." *Id.* ¶ 140. "Patients in Ft. Dodge do not wish to travel to Des Moines to receive care. Patients in Spencer do not wish to travel to Sioux City, Sioux Falls, or Minneapolis to receive care. Patients in Des Moines do not wish to travel to Omaha or elsewhere to receive care." *Id.* ¶ 135. Patients seeking vitreoretinal care "prefer to stay in their respective cities to receive care." *Id.* Many vitreoretinal patients are elderly, infirm, and relatively immobile. *Id.* ¶ 136. In addition, vitreoretinal patients often depend on family members or caregivers with limited time to drive them to appointments. *Id.* ¶ 137. Vitreoretinal patients' limited mobility and caregivers' limited time prevent vitreoretinal patients "from driving from Spencer, Des Moines, or Ft. Dodge to visit a substitute provider in Omaha, Sioux City, Sioux Falls, or elsewhere" for vitreoretinal care. *See id.* ¶¶ 136–37.

Alternatively, Plaintiffs allege Central Iowa—comprised of "the middle third of the state," including Lamoni, Chariton, Pella, Ottumwa, Des Moines, Ames, Boone, Winterset, Ft. Dodge, Iowa Falls, Webster City, and Charles City, among others—constitutes the geographic market for

vitreoretinal care. *Id.* ¶¶ 142–43. As Plaintiffs indicated at the hearing, the Central Iowa geographic market does not include Spencer. Plaintiffs allege "these cities comprise the primary and secondary service areas for Wolfe Clinic and its direct competitors." *Id.* ¶ 143. Plaintiffs allege "Central Iowa is a proper geographic market because healthcare providers compete for patients located in the area, healthcare providers prefer to practice locally in the area rather than move their practice, and payors require providers in Central Iowa." *Id.*

There are "high barriers to entry in the vitreoretinal care market" due to the education and training required to provide vitreoretinal care. *Id.* ¶ 149. Plaintiffs allege independent vitreoretinal care clinics require significant capital investment to open. *Id.* ¶ 150. Referral networks from optometrists for vitreoretinal care "tend to be well-established," and it is difficult for vitreoretinal surgeons opening new practices to cultivate referral sources. *Id.* ¶ 151. Retina surgeons do not travel, and once a surgeon establishes a practice and patient base, it is difficult to leave one city and build new practices in another location. *Id.* ¶ 141. Plaintiffs allege Par is the only independent retina surgeon in Des Moines, Fort Dodge, and Spencer. *Id.* ¶ 160.

### E.     Procedural Posture

Plaintiffs sue Wolfe Clinic, Nielsen, Alliman, and Saggau. As to Wolfe Clinic, Plaintiffs allege monopolization and attempted monopolization, in violation of the Sherman Act, 15 U.S.C. § 2, and Iowa Code §§ 553.5 (Count I). *Id.* ¶¶ 169–81. As to all Defendants, Plaintiffs allege violations of Iowa law: breach of paragraph seven the Settlement Agreement (Count II); breach of paragraph nine of the Settlement Agreement (Count III); breach of the implied covenant of good faith and fair dealing (Count IV); defamation per se (Count V); defamation by omission (Count VI); false light (Count VII); intentional interference with a contract (Count VIII); intentional interference with business relations (Count IX); fraudulent inducement (Count X); civil conspiracy (Count XI); recission (Count XII); and punitive damages (Count XIII). *Id.* ¶¶ 182–267.

Defendants move to dismiss Plaintiffs' monopolization claim (Count I), defamation claims (Counts V and VI), false light claim (Count VII), intentional interference and civil conspiracy claims (Counts VIII, IX, and XI), and fraud claims (Counts X and XII). Sealed Partial Mot. Dismiss, ECF No. 48. Plaintiffs resist Defendants' motion. Pls.' Sealed Resist. Defs.' Partial Mot. Dismiss, ECF No. 77. On March 31, 2022, the Court held oral argument on Defendants' motion to dismiss. Hr'g Mins., ECF No. 86. At the hearing, attorneys Carl Burkhalter, Angel West, and Thomas Goodhue represented Plaintiffs. *Id.* Attorneys Mark Weinhardt, Nathan Converse, and Peter Schwingler represented Defendants. *Id.* Having considered the parties' briefing and arguments made at the hearing, the Court grants Defendants' partial motion to dismiss and remands Plaintiffs' remaining state law claims.

## III.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). "The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party 'fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved.'" *Topchian v. JP Morgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) (quoting *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir. 1999)). The Court must accept as true all factual allegations in the complaint, but not its legal conclusions. *Iqbal*, 556 U.S. at 678–79 (citing *Twombly*, 550 U.S. at 555–56).

To survive a motion to dismiss, a plaintiff must plead and prove a plausible basis for each element of the claim. *Id.* at 678. A plausible claim for relief "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plaintiffs must

"nudge[ ] their claims across the line from conceivable to plausible, [else] their complaint must be dismissed." *Twombly*, 550 U.S. at 570. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## IV.   ANALYSIS

First, the Court considers Plaintiffs' claims for monopolization and attempted monopolization alleged in Count I. Then, the Court addresses Plaintiffs' fraudulent inducement and rescission claims alleged in Counts X and XII. Next, the Court considers whether the Settlement Agreement precludes Plaintiffs' tort claims and civil conspiracy claim. For the reasons set forth below, the Court grants Defendants' motion to dismiss. Finally, the Court considers whether to retain jurisdiction over Plaintiffs' remaining state law claims. As described below, the Court declines to retain jurisdiction over Plaintiffs' remaining claims.

### A.   Antitrust Claims (Count I)

In Count I, Plaintiffs allege federal and state claims for monopolization and attempted monopolization, in violation of § 2 of the Sherman Act and Iowa Code §§ 553.5. ECF No. 4 ¶¶ 169–81. Defendants argue these claims should be dismissed because Plaintiffs fail to allege a geographic market. ECF No. 48-1 at 34–38. They also argue Plaintiffs fail to allege Defendants engaged in anticompetitive conduct or Plaintiffs experienced an antitrust injury. *Id.* at 38–46. Plaintiffs resist, arguing they sufficiently allege a geographic market, exclusionary conduct, and antitrust injury. ECF No. 77 at 21–32.

First, the Court addresses whether Plaintiffs have statutory standing to allege the antitrust claims. The Court finds Plaintiffs fail to allege an antitrust injury sufficient to support statutory

standing. This is a sufficient basis to dismiss Plaintiffs' monopolization and attempted monopolization claims in Count I. Notwithstanding Plaintiffs' lack of statutory standing, the Court addresses the merits of Plaintiffs' federal monopolization and attempted monopolization claims and finds Plaintiffs fail to allege a geographic market. As such, dismissal of Plaintiffs' federal and state monopolization and attempted monopolization claims alleged in Count I is warranted for this reason as well.

### 1.      Statutory standing

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. The Sherman Act "directs itself not against conduct, which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. It does not do so out of solicitude for private concerns but out of concern for the public interest." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).

To state a claim under the Sherman Act, a plaintiff must allege facts demonstrating statutory standing in addition to Article III standing. *See Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 809 (8th Cir. 1987) (discussing statutory standing under the Sherman Act). Article III standing addresses "the constitutional power of a federal court to resolve a dispute," while statutory standing pertains to whether "Congress . . . has accorded *this* plaintiff the right to sue the defendant to redress [the plaintiff's] injury." *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 934 (8th Cir. 2014) (internal quotation marks and citation omitted). "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Associated Gen. Contractors of Cal. Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983). Whether a plaintiff has statutory standing to bring an antitrust claim

"requires an evaluation of the plaintiff's harm, the alleged wrongdoing by the defendant, and the relationship between them." *Gen. Indus. Corp.*, 810 F.2d at 809. The Court must determine whether the plaintiff is "the target of the anticompetitive activity, not one who has merely suffered indirect, secondary, or remote injury." *Midwest Commc'ns v. Minn. Twins, Inc.*, 779 F.2d 444, 451 (8th Cir. 1985) (internal quotation marks and citation omitted).

In evaluating a plaintiff's statutory standing, the Court considers the causal connection between the alleged antitrust violation and harm to the plaintiff, and whether that harm was intended; whether the alleged harm is of a type Congress sought to redress in providing a private remedy for violations of the antitrust laws; the directness of the alleged antitrust injury; the existence of more direct victims of the alleged antitrust injury; and problems of identifying damages and apportioning them among those directly and indirectly harmed. *Associated Gen. Contractors of Cal.*, 459 U.S. at 537–45; *accord Lovett v. Gen. Motors Corp.*, 975 F.2d 518, 520 (8th Cir. 1992). "The first two of these antitrust-standing factors together encompass the concept of 'antitrust injury.'" *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 311 (4th Cir. 2007); *see also Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986); *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977). The other three factors focus on the directness or remoteness of the plaintiff's alleged antitrust injury. *Novell, Inc.*, 505 F.3d at 311.

"Antitrust injury is a threshold issue that plaintiffs must establish in order to have standing to sue under the antitrust laws." *Fischer v. NWA, Inc.*, 883 F.2d 594, 597 n.5 (8th Cir. 1989). "An antitrust injury is 'injury of the type that the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1144–45 (8th Cir. 2011) (quoting *Brunswick Corp.*, 429 U.S. at 489). "[I]f there is no showing of injury, or if the injury alleged . . . is not an 'antitrust injury,' the plaintiff does not have a claim cognizable under the antitrust laws." *Midwest Commc'ns*, 779 F.2d at 450.

An antitrust injury represents "the type of loss that the claimed violations . . . would be likely to cause." *Brunswick Corp.*, 429 U.S. at 489. "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by violation." *Brunswick Corp.*, 429 U.S. at 489. An "injury, although causally related to an antitrust violation, . . . will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive [behavior] . . . , since it is inimical to the antitrust laws to award damages for losses stemming from continued competition." *Atl. Richfield Co.*, 495 U.S. at 334 (cleaned up). "[T]he antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued competition, but only against the loss of profits from practices forbidden by the antitrust laws." *Cargill, Inc.*, 479 U.S. at 116.

Plaintiffs fail to plausibly allege statutory standing. *Cf. Fischer*, 883 F.2d at 597 n.5. Plaintiffs allege no facts demonstrating they experienced an antitrust injury. *Cf. Associated Gen. Contractors of Cal.*, 459 U.S. at 537–45; *Atl. Richfield Co.*, 495 U.S. at 344. Plaintiffs allege Defendants defamed Par; falsely advised patients that Defendants did not know Par's whereabouts; discouraged potential referring optometrists and physicians from referring patients to Par or Par Retina; contacted members of the ophthalmology community outside of Iowa and disparaged Par; and threatened Wolfe Clinic employees with repercussions if they assisted Par after his termination. ECF No. 4 ¶¶ 30–38. Plaintiffs also allege Defendants acquired optometry clinics in communities to maintain control over vitreoretinal surgical referrals. *See id.* ¶¶ 127–28. As a result of Defendants' conduct, Plaintiffs allege Par lost patients and referral sources. *See id.* ¶¶ 1, 103, 176, 179–80. These alleged injuries are not antitrust injuries because they do not stem from conduct affecting competition in the vitreoretinal care market generally. *Cf. Cargill, Inc.*, 479 U.S.

at 116; *Atl. Richfield Co.*, 495 U.S. at 344. Rather, the alleged injuries are a result of Defendants' activity targeted at Plaintiffs and demonstrate an injury to Plaintiffs as competitors—the loss of some patients and referral sources. *Cf. Fair Isaac Corp.*, 650 F.3d at 1144–45; *see also Bushnell Corp. v. ITT Corp.*, 973 F. Supp. 1276, 1285 (D. Kan. 1997) ("It is clear from the Supreme Court precedent that making life difficult for one particular competitor in the absence of conduct that otherwise affects the entire market does not give rise to antitrust injury.").

Plaintiffs allege no facts indicating Defendants' purchase of optometry clinics has prevented vitreoretinal providers from entering the market. Plaintiffs allege such action "makes it very difficult" for providers to enter the market. ECF No. 4 ¶ 127. In addition, Plaintiffs allege facts demonstrating Par Retina operates in Des Moines, Spencer, and Fort Dodge and provides vitreoretinal care to patients, and Par has provided care to patients. *See id.* ¶¶ 3, 12, 100. These allegations indicate Plaintiffs compete in the vitreoretinal care market. Because Plaintiffs fail to plausibly allege antitrust injury, they cannot establish the requisite statutory standing sufficient to support their antitrust claims in Count I.

Plaintiffs also fail to demonstrate they are the proper plaintiffs to bring suit for the alleged injuries to vitreoretinal care consumers. *See Novell, Inc.*, 505 F.3d at 311; *cf. Associated Gen. Contractors of Cal.*, 459 U.S. at 537–45. Plaintiffs allege Defendants' actions impeded patients' access to a doctor of their choice, caused patient care in Des Moines, Spencer, and Fort Dodge to suffer, and reduced patient access to care. ECF No. 4 ¶¶ 40, 178. Even if these injuries are of the type the antitrust laws were intended to prevent and resulted from Defendants' anticompetitive conduct, Plaintiffs are not the proper plaintiffs to pursue the claims because of their remoteness from the alleged injuries. *Cf. Brunswick Corp.*, 429 U.S. at 489. Plaintiffs' allegations regarding patients concern injury to vitreoretinal care consumers. *See* ECF No. 4 ¶¶ 40, 178. Par is not a consumer of vitreoretinal care; he is a provider of vitreoretinal care. *See*

*id.* ¶¶ 8–12. Similarly, Par Retina is a provider facility. *See id.* ¶¶ 11–12. Therefore, Plaintiffs are only indirectly affected by these alleged antitrust injuries to consumers. *See Associated Gen. Contractors of Cal.*, 459 U.S. at 537–45. "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general." *Atl. Richfield*, 495 U.S. at 345 (omission in original) (internal quotation marks omitted) (quoting *Associated Gen. Contractors of Cal.*, 459 U.S. at 542). Plaintiffs' role as providers alleging injury to consumers diminishes the justification for finding they are the appropriate plaintiffs to allege injury to consumers. *Cf. id.* This fact supports finding Plaintiffs lack antitrust standing to sue Defendants for the alleged injuries to vitreoretinal care consumers.

Because Plaintiffs fail to allege antitrust injury and the alleged injuries to vitreoretinal care consumers indirectly affect them, the Court dismisses their claims for monopolization and attempted monopolization in Count I for lack of statutory standing.

### 2.    Federal antitrust claims (Count I)

Notwithstanding the lack of statutory standing, the Court addresses whether Plaintiffs state a claim for monopolization or attempted monopolization in violation of the Sherman Act as alleged in Count I.

The offense of monopoly under § 2 of the Sherman Act, as alleged in Count I, requires the "possession of monopoly power in the relevant [product] market and . . . the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *see Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998). The offense of attempted monopoly under § 2 of the Sherman Act, also alleged

in Count I, requires the plaintiff to demonstrate the defendant engaged in "[(1)] predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc.*, 506 U.S. at 456; *see also Gen. Indus. Corp.*, 810 F.2d at 801. Thus, to state a claim under § 2 of the Sherman Act the plaintiff must "identify a valid relevant [product] market" and plausibly allege monopoly power or the dangerous probability of achieving monopoly power in that relevant product market. *Double D Spotting Serv.*, 136 F.3d at 560; *see Verizon Comms. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *Spectrum Sports, Inc.*, 506 U.S. at 459–60; *Grinnell Corp.*, 384 U.S. at 570–71. "The relevant product market has two components—a product market and a geographic market." *Double D Spotting Serv.*, 136 F.3d at 560.

Finding Plaintiffs fail to allege facts to support defining the geographic markets as Des Moines, Spencer, and Fort Dodge, or alternatively Central Iowa, they cannot plausibly identify the second component of a "relevant product market" as required to allege monopolization and attempted monopolization. As such, the Court declines to consider whether Plaintiffs allege monopoly power or the dangerous probability of monopoly power.

a.    Product market

"A relevant product market consists of 'products that have reasonable interchangeability for the purposes for which they are produced—price, use[,] and qualities considered.'" *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956)). "A court's determination of the limits of a relevant product market requires inquiry into the choices available to consumers." *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 596 (8th Cir. 2009). The Court focuses on how "consumers will shift from one product to the other in response to changes in their relative costs." *Id.* (internal quotation marks and citation omitted). Courts employ the hypothetical

monopolist test to determine whether a plaintiff has sufficiently defined the relevant product market. *Fed. Trade Comm'n v. Sanford Health*, 926 F.3d 959, 963 (8th Cir. 2019) (citing *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015)). "The test asks whether a hypothetical monopolist could impose a 'small but significant nontransitory increase in price' in the proposed market." *Id.* (quoting *Saint Alphonsus*, 778 F.3d at 784). "If consumers would defeat the price increase by switching to products outside of the proposed market, then the market definition is too narrow and must be redefined." *Id.*

Plaintiffs allege sufficient facts to identify the vitreoretinal care market as the product market. *See* ECF No. 4 ¶ 144; *cf. Double D Spotting Serv.*, 136 F.3d at 560. Their allegations indicate the vitreoretinal care market requires specialized training—"[o]phthalmologists or other doctors or surgeons who are not trained retinal surgeons are not adequate substitutes for retinal surgeons"—and maintains distinct customers—those individuals with the types of back-of-the-eye conditions requiring surgical treatment. *See* ECF No. 4 ¶¶ 8, 144; *cf. Brown Shoe v. United States*, 370 U.S. 294, 325 (1962) (identifying factors to assess submarkets, including distinct customers and unique characteristics). Because vitreoretinal care targets specific types of back-of-the-eye conditions requiring specialized surgery, vitreoretinal care is not easily substituted or reasonably interchangeable with other medical or ophthalmologic services. ECF No. 4 ¶ 147; *cf. PepsiCo*, 315 F.3d at 105. It is a distinct service with distinct customers. The complaint contains facts indicating vitreoretinal care is an inelastic product because changes in price will have a minimal effect on its consumption, including the unique nature of conditions requiring vitreoretinal care and the unique tools required to provide vitreoretinal care. ECF No. 4 ¶¶ 144; *see Davies v. Genesis Med. Ctr. Anesthesia & Analgesia, P.C.*, 994 F. Supp. 1078, 1098–99 (S.D. Iowa 1998) (finding the plaintiff failed to allege a product market for cardiac anesthesiology services when the complaint relied on factual assertions regarding general medical care and anesthesiology services

without indicating cardiac anesthesiology services were not interchangeable with general anesthesiology services); *Park Irmat Drug Corp. v. Express Scripts Holing Co.*, 911 F.3d 505, 517 (8th Cir. 2018) (affirming dismissal of the plaintiff's § 2 Sherman Act claims for failure to allege a relevant product market when the complaint did not account for alternative products available to consumers); *cf. Inline Packaging , LLC v. Graphic Packaging Int'l Inc.*, 164 F. Supp. 3d 1117, 1125–26 (D. Minn. 2016) (denying dismissal when the plaintiff alleged facts demonstrating the alleged product served a specialized purpose and had unique characteristics). Due to these product characteristics, a hypothetical monopolist could impose a small but significant price increase within the vitreoretinal care market and consumers would likely not switch to alternative products. *Cf. Sanford Health*, 926 F.3d at 963. Plaintiffs' identification of the vitreoretinal care market as the relevant product market passes the hypothetical monopolist test. *Cf. id.* As such, Plaintiffs' complaint sufficiently alleges facts identifying vitreoretinal care as the product market.

b.      Geographic market

"[A] geographic market is a geographic area 'in which the seller operates, and to which . . . purchaser[s] can practicably turn for supplies.'" *Little Rock Cardiology Clinic*, 591 F.3d at 598 (omission and second alteration in original) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)). In other words, "a market is the group of sellers or producers who have the actual or potential ability to deprive each other of significant levels of business." *Saint Alphonsus*, 778 F.3d at 784 (internal quotation marks and citation omitted).

When defining a geographic market in the medical setting, the end goal is to "delineate a geographic area where . . . 'few' patients leave . . . and 'few' patients enter." *Little Rock Cardiology Clinic*, 591 F.3d at 598 (second omission in original) (internal quotation marks and citation omitted). First, the Court must determine "whether a plaintiff has alleged a geographic market that includes the area in which a defendant supplier draws a sufficiently large percentage of its

business—the market area in which the seller operates, its trade area." *Id.* (internal quotation marks and citation omitted). "'[T]rade area' considers the extent to which customers will travel in order to do business [with the Defendant]." *Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 346 (8th Cir. 1995) (quoting H. Hovenkamp, Federal Antitrust Policy, § 3.6d, at 113–14). Next, the Court must "determine whether a plaintiff has alleged a geographic market in which only a small percentage of purchasers have alternative suppliers to whom they could practicably turn in the event that a defendant supplier's anticompetitive actions result in a price increase." *Little Rock Cardiology*, 591 F.3d at 598. This inquiry "considers the extent to which customers will travel in order to *avoid* doing business [with the Defendant]." *Bathke*, 64 F.3d at 346 (quoting H. Hovenkamp, Federal Antitrust Policy, § 3.6d, at 113–14).

Plaintiffs allege the Iowa cities of Des Moines, Spencer, and Fort Dodge, constitute individual, local geographic markets. ECF No. 4 ¶¶ 135, 173. Alternatively, they allege Central Iowa, constitutes the geographic market. *Id.* ¶¶ 142, 173. The Court considers the sufficiency of Plaintiffs' allegations as to each proposed geographic market.

i.      Des Moines, Spencer, & Fort Dodge geographic markets

Plaintiffs fail to state facts supporting Des Moines, Spencer, and Fort Dodge as individual, local geographic markets. *Cf. Double D Spotting Serv.*, 136 F.3d at 560. First, their allegations fail to account for the trade area in which Defendants draw "a sufficiently large percentage of its business." *Cf. Little Rock Cardiology Clinic*, 591 F.3d at 598 ("This crucial first step serves as a limitation, preventing antitrust plaintiffs from delineating arbitrarily narrow geographic markets."). Plaintiffs indicate "an overwhelming number of retina patients" seeking care in the local geographic markets of Des Moines, Spencer, and Fort Dodge live "in" or "near" those cities. ECF No. 4 ¶ 140. Although some customers live in these areas, allegations that some consumers of vitreoretinal care in Des Moines, Spencer, and Fort Dodge live "near" those specific markets

18

necessarily imply such consumers are not located in the identified geographic markets. As such, the alleged geographic markets fails to account for the larger trade area in which Defendants operate. *Cf. Little Rock Cardiology Clinic*, 591 F.3d at 598. Without including the locations from which Defendants draw their customers in the geographic market definition, the geographic markets of the cities of Des Moines, Spencer, and Fort Dodge are too narrowly construed. *Cf. id.* It is not enough to state that some of their customers come from within these cities. *Cf. id.* Plaintiffs also appear to allege customers in Des Moines, Spencer, and Fort Dodge patronize Wolfe Clinic because it maintains a monopoly in those areas. *See* ECF No. 4 ¶¶ 2, 19, 26, 30–39, 135–40. With these allegations, Plaintiffs attempt to define the geographic market by identifying a small area around some of Defendants' locations—despite alleging Defendants operate across Iowa—and alleging most potential customers from these limited areas patronize Wolfe Clinic. *See id.* ¶ 14, 19. In *Little Rock Cardiology Clinic PA v. Baptist Health*, the Eighth Circuit rejected a local geographic market premised on similar facts. *See* 591 F.3d at 599–600 ("By limiting the geographic market [to one in which a low percentage of patients leave], [the plaintiff] is able to gerrymander the relevant market to an artificially narrow location, the location where cardiology procedures take place."). Because Plaintiffs' city-specific geographic markets are too narrow, their complaint fails to allege Des Moines, Spencer, and Fort Dodge are the proper geographic markets at issue.

Second, Plaintiffs' allegations supporting the city-specific geographic markets of Des Moines, Spencer, and Fort Dodge also fail to address the critical question of where consumers of vitreoretinal care services in these locations could reasonably turn for alterative care. *See Davies*, 994 F. Supp. at 1100 (dismissing the plaintiff's monopolization claim for failure to allege facts addressing where consumers of cardiac anesthesiology services could reasonably turn for alternative care); *cf. Little Rock Cardiology Clinic*, 591 F.3d at 598. Plaintiffs allege consumers

do not "want" to leave the Des Moines, Spencer, and Fort Dodge markets for care in Sioux City, Iowa, Sioux Falls, South Dakota, Minneapolis, Minnesota, or Omaha, Nebraska. ECF No. 4 ¶ 135. They also allege facts indicating "substitute providers" exist in these cities. *See id.* ¶ 136. In the antitrust context, the geographic market is not defined by consumers' preferences; it is defined by the commercial realities facing consumers in the event of monopolistic pricing—i.e., alternative locations where they could reasonably seek the product or service. *See Saint Alphonsus*, 778 F.3d at 784; *Morgenstern v. Wilson*, 29 F.3d 1291, 1296 (8th Cir. 1994) (finding geographic market definition was too narrow because it failed to take into account where cardiac surgery service consumers could practicably go for services versus where they actually went); *Bathke*, 64 F.3d at 346 (finding geographic market constrained to individual towns was too narrow because it failed to address where gasoline consumers could practicably turn for alternatives); *cf. Little Rock Cardiology*, 591 F.3d at 598. Plaintiffs' allegation indicates care providers in other cities, such as Sioux City, Iowa, Sioux Falls, South Dakota, Minneapolis, Minnesota, and Omaha, Nebraska, are potential alternative sources of vitreoretinal care for consumers in Des Moines, Spencer, and Fort Dodge—despite consumers' alleged preference not to travel to these locations. *See* ECF No. 4 ¶¶ 135–36. Yet, Plaintiffs' geographic market definitions do not embrace these other locations. As a result, Plaintiffs' complaint fails to account for these—or other—alternative locations where vitreoretinal care consumers in Des Moines, Spencer, and Fort Dodge could reasonably turn.

Finally, to support the city-specific geographic market definition, Plaintiffs incorrectly focus their allegations on vitreoretinal consumers' characteristics rather than the characteristics of the vitreoretinal care market. *Cf. Grinnell Corp.*, 384 U.S. at 570–71; *Saint Alphonsus*, 778 F.3d at 784. Plaintiffs provide facts regarding vitreoretinal care consumers' characteristics— such as being elderly, infirm, immobile, reliant on others for transportation, and requiring multiple

appointments during the year. *See* ECF No. 4 ¶¶ 136–39. Plaintiffs' complaint fails to provide facts about the vitreoretinal care market in the alleged geographic locations. *Cf. Saint Alphonsus*, 778 F.3d at 784. It provides no facts to apprise the Court of competitors in the geographic area that have the actual or potential ability to deprive each other of significant levels of business. *See id.* While consumer characteristics may inform how far a consumer is willing to travel for an alternative source of vitreoretinal care—which in turn may constrain the limits of a geographic market—without information about the market and the choices available to consumers, the Court cannot contextualize vitreoretinal consumers' characteristics or analyze the effect of Defendants' alleged anticompetitive conduct. *See Fed. Trade Comm'n v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir. 1995) ("Without a well-defined relevant market, an examination of a transaction's competitive effects is without context or meaning"). For these reasons, Plaintiffs' allegations that Des Moines, Spencer, and Fort Dodge are the proper geographic markets are insufficient.

ii.   Central Iowa geographic market

Plaintiffs' allegations as to the alternative purported geographic market—Central Iowa— are similarly insufficient. *Cf. Little Rock Cardiology Clinic*, 591 F.3d at 598. First, Plaintiffs fail to provide facts about the trade area of the vitreoretinal care market in Central Iowa to support drawing the boundary around "the middle third of the state." ECF No. 4 ¶ 142; *cf. Little Rock Cardiology Clinic*, 591 F.3d at 598. They allege Central Iowa comprises the "primary and secondary service areas for Wolfe Clinic and its direct competitors." *Id.* ¶ 143. Even if Plaintiffs' allegations about the primary and secondary service areas suggest Central Iowa is an accurate description of Defendants' trade area, Plaintiffs fail to provide facts to support constraining the geographic market to this region. *Cf. Little Rock Cardiology Clinic*, 591 F.3d at 598; *Bathke*, 64 F.3d at 346. They provide no allegations regarding the Central Iowa market, including facts as to Defendants' direct competitors in Central Iowa or the number and location of vitreoretinal

care providers in this region. *See Saint Alphonsus*, 778 F.3d at 784. Without such information, the Court cannot assess the accuracy of Plaintiffs' geographic market definition, or assess the significance of their allegations about Defendants' primary and secondary service areas. *Cf. id.* Like the lack of factual information regarding the vitreoretinal care market and commercial realities in Des Moines, Spencer, and Fort Dodge, Plaintiffs' allegations regarding Central Iowa are insufficient due to their failure to provide information about reasonable alternative sources of care. *Cf. Bathke*, 64 F.3d at 346.

Even if Plaintiffs alleged alternative sources of care, they nonetheless fail to support their broad allegations regarding the Central Iowa geographic market with facts. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557. Plaintiffs allege "healthcare providers compete for patients located in [Central Iowa]." ECF No. 4 ¶ 143. Healthcare is not the alleged product at issue; Plaintiffs identify vitreoretinal care as the relevant product. *Id.* ¶ 172. Broad allegations regarding "healthcare providers" have no bearing on the vitreoretinal care market and the specialized providers unique to this alleged market—vitreoretinal surgeons with specialized training to care for back-of-the-eye conditions. Plaintiffs also allege "payors require providers in Central Iowa." *Id.* ¶ 143. Once again, these broad allegations regarding "providers" fails to account for the type of provider specific to the vitreoretinal care market. Similarly, Plaintiffs' allegation regarding "payors" has no bearing on the geographic market definition. *See Little Rock Cardiology Clinic*, 591 F.3d at 597. Plaintiffs' monopolization and attempted monopolization claims focus on the alleged harm to vitreoretinal care providers—their access to fewer patients. Including allegations regarding payors "analyzes the issue from the wrong side of the transaction"—the consumer as opposed to the supplier—and provides no information regarding alternative practitioners available to patients, which is the aspect of competition relevant to Plaintiffs' claim. *See id.* Plaintiffs do not identify any particular providers competing for patients in Central Iowa or payors' requirements

in Central Iowa constraining consumer's choice. Plaintiffs allege only broad assertions. *Cf. PNY Techs., Inc. v. SanDisk Corp.*, No. 11-cv-04689-WHO, 2014 WL 2987322, at *6–7 (N.D. Cal. July 2, 2014) (dismissing the plaintiff's attempted monopolization claim for its lack of factual support and its reliance on conclusory, overly general, and speculative allegations). Without some facts to support these generalized allegations about the Central Iowa market, Plaintiffs' complaint is insufficient to support demarcating the geographic market for vitreoretinal care as Central Iowa.

Second, Plaintiffs fail to allege facts indicating a small percentage of consumers in the Central Iowa market have alternative suppliers to practicably turn to. *Cf. Little Rock Cardiology*, 591 F.3d at 598. Plaintiffs provide no facts regarding consumer behavior in the Central Iowa market or facts regarding alternative consumer options in the Central Iowa market. *See generally* ECF No. 4; *cf. Saint Alphonsus*, 778 F.3d at 784. Without such information, the Court cannot assess whether the Central Iowa geographic demarcation adequately accounts for the extent consumers will travel in order to avoid doing business with Wolfe Clinic providers in this area. *Cf. Bathke*, 64 F.3d at 346. As such, Plaintiffs fail to allege facts regarding the second component required to adequately allege a geographic market.

Because Plaintiffs fail to allege facts to support defining the geographic markets as Des Moines, Spencer, and Fort Dodge, or alternatively Central Iowa, they cannot plausibly identify a relevant product market as required to allege monopolization and attempted monopolization. As such, the Court declines to consider whether Plaintiffs allege monopoly power or the dangerous probability of monopoly power. Dismissal of Plaintiffs' federal antitrust claims alleged in Count I is warranted on this ground, as well.

### 3.    Iowa antitrust claims (Count I)

In Count I, Plaintiffs allege monopolization and attempted monopolization in violation of Iowa law. ECF No. 4 ¶¶ 169–81. They assert Iowa Code § 553.11 "creates a private right of action

for those harmed by antitrust violations." *Id.* ¶ 171. They also broadly assert state antitrust violations under Iowa Code § 553.5, which prohibits monopolies. *See id.* ¶¶ 169–81.

Section 553.11 is entitled "Protective orders." Iowa Code § 553.11. It permits a district court to "make any order which justice requires to protect [a] person from annoyance, embarrassment, oppression, or undue burden of expense." *Id.* It does not create a private right of action for individuals harmed by antitrust violations. Rather, Iowa Code § 553.12 creates a private right of action, permitting a person who is injured under Iowa's competition law to bring suit. Iowa Code § 553.12. Iowa antitrust laws are construed in accordance with federal antitrust laws. *See* Iowa Code § 553.2 ("[Iowa Competition Law] shall be made to achieve uniform application of the state and federal laws prohibiting restraints of economic activity and monopolistic practices.").

For the reasons indicated in the Court's analysis of Plaintiffs' federal claims for monopolization and attempted monopolization alleged in Count I, Plaintiffs' Iowa antitrust claims fail. *See supra Part* IV.A.2; *cf. Double D Spotting Serv.*, 136 F.3d at 561 (dismissing the plaintiff's antitrust claims under Iowa law for the same reasons the court dismissed the plaintiffs' federal antitrust claims); *Mahaska Bottling Co. v. PepsiCo Inc.*, 271 F. Supp. 3d 1054, 1080 (S.D. Iowa 2017) ("To the extent [the plaintiff's] allegations fail to state a claim [for attempted monopolization] under federal antitrust law . . . they also fail to state a claim under the Iowa Competition Law."). As such, the Court dismisses Plaintiffs' claims for monopolization and attempted monopolization under Iowa law as alleged in Count I.

## B.      Fraud Claims (Counts X and XII)

Plaintiffs allege Defendants fraudulently induced them to enter into the mediation Settlement Agreement when Defendants indicated they had not dissuaded referring providers from working with Par. *See* ECF No. 4 ¶¶ 81–84, 240–248. Plaintiffs also request rescission of the

Settlement Agreement. *See id.* ¶¶ 249–55. Defendants move to dismiss Plaintiffs' claims for fraudulent inducement and recission, arguing the Settlement Agreement's anti-reliance clause prohibits these claims. ECF No. 48 ¶ 6.[1] Plaintiffs resist, arguing they state plausible claims. ECF No. 77 at 7. Plaintiffs contend the Settlement Agreement's disclaimers do not bar their claims. *Id.* at 8–15.

The Court addresses the parties' arguments regarding the Settlement Agreement and finds it precludes Plaintiffs' fraudulent inducement and rescission claims. Dismissal of Counts X and XII is warranted on this ground. Nonetheless, the Court addresses the merits of Plaintiffs' fraudulent inducement and rescission claims. Because Plaintiffs fail to adequately plead fraud and justifiable reliance, dismissal of Counts X and XII is warranted for this reason as well.

### 1.  Settlement Agreement

Under Iowa law, "[w]here there is evidence of fraudulent misrepresentations in the inception of a contract such misrepresentations can be the basis for . . . an action . . . for damages, despite the limiting provisions of a contract." *Hall v. Crow*, 34 N.W.2d 195, 199 (Iowa 1948). Iowa courts have not considered the effect of an anti-reliance clause on a fraudulent inducement claim. "If the state supreme court has not decided [an] issue, [the federal court's] role is to predict how that court would rule." *Meyer v. McKenzie Elec. Coop., Inc.*, 947 F.3d 506, 509 (8th Cir. 2020). Iowa courts have considered the effect of a contract's integration clause on a

---

[1] Alternatively, Defendants argue these claims must be dismissed because the alleged fraudulent communication supporting them "occurred solely in the context of the mediation," and such confidential communications "are off limits as a source of evidence." ECF No. 48 ¶ 8. Defendants provide no authority from the Eighth Circuit Court of Appeals or this district to support this argument. *See* Defs.' Br. Supp. Mot. Dismiss 27, ECF No. 48-1. Because Par fails to state a claim for fraudulent inducement, the Court does not address this aspect of Defendants' argument. *See infra* Part IV.B.2–3. For the same reason, the Court does not address Par's responsive argument that the Mediation Agreement is "outside the scope of the pleadings." *See* Pls.' Resist. Defs.' Mot. Dismiss 17, ECF No. 77.

fraudulent inducement claim. *See Robinson v. Perpetual Servs. Corp.*, 412 N.W.2d 562, 565–67 (Iowa 1987); *Whalen v. Connolly*, 545 N.W.2d 284, 294 (Iowa 1996); *see also Miller v. Elliott Aviation Aircraft Sales, Inc.*, No. 4:13-cv-00161-JAJ, 2014 WL 12601040, at *9–13 (S.D. Iowa Mar. 31, 2014) (comparing and contrasting *Robinson* and *Whalen*). The Iowa Supreme Court's analysis of whether a contract's integration clause precludes a claim of fraudulent inducement is instructive to the analysis of the Settlement Agreement here.

In *Robinson v. Perpetual Services*, the Iowa Supreme Court determined some assurances or representations are not subject to an integration clause in a written contract. 412 N.W.2d at 565–67. There, the plaintiff agreed to purchase a real estate franchise from the defendant based on the defendant's statement that it could not agree to give plaintiff an "exclusive franchise" because such agreements were illegal, however the defendant stated it would not solicit other franchises in the plaintiff's geographic area. *Id.* at 564. The contract contained an integration clause stating, "there are no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied [in the contract], which are of any force . . . to this Agreement." *Id.* at 567. Relying on its decision in *Hall v. Crow*, the Court affirmed the jury's verdict for the plaintiff, finding the jury may have "considered this fine-print, boilerplate franchise provision was not intended to encompass assurances" by the defendant made to persuade the plaintiff to sign the contract. *Id.*; *see Hall*, 34 N.W.2d at 199 ("fraudulent misrepresentation in the inception of a contract . . . can be the basis for an action for damages, despite the limiting provisions of the contract").

By contrast, in *Whalen v. Connelly*, the Iowa Supreme Court determined an integration clause prevented the plaintiff from establishing the necessary fraud for a fraudulent inducement claim. 545 N.W.2d at 294. There, the plaintiff alleged the defendants fraudulently induced him to enter the agreement by making "promises . . . regarding the extent of [the plaintiff's] five percent

of the deal, a management position . . . , and expansion rights." *Id.* The court upheld the district court's grant of summary judgment to the defendant because the parties' contract accounted for each of the alleged misrepresentations. *Id.* at 292–93. The court found "all of the alleged representations involved matters that were specifically addressed in the integrated written partnership agreements." *Id.* at 294. The contract granted the partnership authority to expand its business to other states, permitted general partners to engage in other ventures without requiring them to offer those opportunities to the partnership or other partners, and delineated the partnership's management structure. *See id.* at 292–94. The court contrasted its decision with *Robinson* stating, "[a]lthough, we have allowed fraudulent inducement claims to proceed despite an integration clause in a contract, we have done so only with regard to misrepresentations concerning facts or circumstances not included in the written contract. . . . To allow [the plaintiff] to proceed would vitiate the parol-evidence rule." *Id.* at 294.

The Eighth Circuit Court of Appeals has applied Iowa law to determine whether contractual language precludes a fraudulent inducement claim. *See Nw. Bank and Trust Co. v. First Ill. Nat'l Bank*, 354 F.3d 721, 725–26 (8th Cir. 2003); *Mitec Partners, LLC v. U.S. Bank Nat'l Ass'n*, 605 F.3d 617, 621–24 (8th Cir. 2010); *see also Miller*, 2014 WL 12601040, at *11–13 (comparing and contrasting *Northwest Bank* and *Mitec*). In *Northwest Bank and Trust v. First Illinois National Bank*, the Eighth Circuit rejected the district court's determination that the contract's integration clause prevented the plaintiff's fraudulent inducement claim. 354 F.3d at 726. There, Northwest Bank entered into a loan participation agreement with First Illinois, whereby First Illinois would act as the lead lender. *Id.* at 723. First Illinois provided Northwest Bank with financial information about the loan recipient. *Id.* After entering into the loan agreement, the loan recipient declared bankruptcy and stopped making loan payments. *Id.* Northwest Bank sued, alleging First Illinois provided "false and misleading" financial information about the loan recipient to induce Northwest

Bank into entering the agreement. *Id.* The parties' contract included a disclaimer provision stating, in part, Northwest Bank "acknowledges that it has made an independent investigation of the Loan . . . . [Northwest Bank] acknowledges that it is not relying upon [First Illinois's] judgment, and that [First Illinois] has made no warranty of any kind . . . in connection with the Loan." *Id.* at 725–26. The district court granted summary judgment to First Illinois. *Id.* at 724. In reversing the district court's decision, the Eighth Circuit explained the principle underlying the rule: "fraudulent inducement precedes the formation of the contract, and . . . to give preclusive effect to language contained therein would allow a party to bind the defrauded party to the contract through the use of a boilerplate disclaimer." *Id.*

In contrast, in *Mitec Partners v. U.S. Bank National Association*, the Eighth Circuit affirmed the district court's grant of summary judgment for U.S. Bank on a fraudulent inducement claim. 605 F.3d at 623. There, a group of investors formed a limited liability company, Mitec Partners, to purchase secured loans in default from U.S. Bank. *Id.* at 619. Prior to confirming the deal, U.S. Bank provided Mitec with documents related to the loans. *Id.* The documents did not include information about "U.S. Bank's third-party lien holder agreement with the S[mall] B[usiness] A[ssociation]," which had lienholder agreements over the loans at issue. *Id.* at 619–20. The contract governing Mitec's purchase of U.S. Bank's loans included a "Representations by Buyer" clause stating Mitec "acknowledges that it has, independently and without reliance upon [U.S.] Bank . . . made [its] own credit analysis and decision to enter into this Assignment Agreement." *Id.* at 621 (first alteration in original). After the purchase, Mitec determined two of the loans were subject to lienholder agreements with the Small Business Administration. *Id.* at 620–21. Prior to the sale, Mitec did not inquire about other liens on the loans. *Id.* at 620–21. Mitec sued U.S. Bank for fraudulent inducement. *Id.* at 621. The Eighth Circuit determined the contract's "Representation to Buyer" clause encompassed the alleged misrepresentations about the other

liens. *Id.* at 623. The court found the clause expressly indicated Mitec's decision to enter into the Agreement was based solely on its own investigation and credit analysis, and not on any statements or omissions by U.S. Bank. *Id.* at 624. The court reasoned the alleged fraudulent misrepresentation at issue was made in the initial loan documents U.S. Bank provided to Mitec which were then "subject to a subsequent, integrated contract that contained multiple, unambiguous disclaimers. Even in the case of alleged oral misrepresentations . . . 'reliance on [an] oral representation . . . can be utterly unjustified in the face of a clear written contradiction.'" *Id.* (quoting *Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 737–38 (Iowa 2009) (alterations in original)). As such, the court affirmed the district court's grant of summary judgment to U.S. Bank on the fraudulent inducement claim. *Id.*

District Courts for the Northern and Southern Districts of Iowa have similarly considered whether an integration clause prevents a fraudulent inducement claim by ascertaining whether the contract encompasses the alleged fraudulent misrepresentations. *See Miller*, 2014 WL 12601040, at *9–13 (denying motion to dismiss the fraudulent inducement claim despite an integration clause because "the representations . . . were not expressly addressed in the final integrated agreement"); *McIrvin v. W. Side Unltd. Corp.*, No. 08-CV-27-LRR, 2010 WL 605651, at *9–11 (N.D. Iowa Feb. 18, 2010) (finding the plaintiff's fraudulent inducement claim was prevented where the contract contemplated the misrepresentations made to the plaintiff); *Jones Distr. Co. v. White Consol. Indus., Inc.*, 943 F. Supp. 1445, 1469–71 (N.D. Iowa 1996) (denying summary judgment on a fraudulent inducement claim because the contract, including a clause permitting termination for cause, did not undermine the alleged pre-contractual assurances by the defendant-manufacturer of a continuing relationship with the plaintiff-distributor).

The inclusion of an integration clause in addition to the specific language of the anti-reliance clause in the Settlement Agreement precludes Plaintiffs' fraudulent inducement

claim. *See Robinson*, 412 N.W.2d at 565–67; *Whalen*, 545 N.W.2d at 294. Plaintiffs argue the Settlement Agreement does not "specifically address Wolfe Clinic's prior assurances" and contend it is for the jury to determine "whether the integration clause or other boilerplate in the Settlement Agreement was intended to encompass the assurances that Wolfe Clinic had not defamed Dr. Par." ECF No. 77 at 11. The Settlement Agreement's integration clause alone may not preclude Plaintiffs' claim, as it could be understood to be "boilerplate" language. *Cf. Robinson*, 412 N.W.2d at 567 (characterizing similar language as the Settlement Agreement's "Entire Agreement" clause as "boilerplate"); *Nw. Bank*, 354 F.3d at 725–26. But the anti-reliance clause makes the Settlement Agreement analogous to the specific contract terms sufficient to preclude the fraudulent inducement claim in *Whalen*, where the Iowa Supreme Court found the specificity of the contract terms precluded the fraudulent inducement claim. *Cf.* 545 N.W.2d at 294. The anti-reliance clause specifically considers fraudulent inducement claims by stating the parties "knowingly and intentionally waive . . . any right to claim . . . they [were] . . . induced to enter into this Agreement fraudulently." ECF No. 4-1 ¶ 6; *cf. Whalen*, 545 N.W.2d at 294 (finding contract precluded fraudulent misrepresentation claim when "all of the alleged representations involved matters . . . specifically addressed in the integrated" contract). This language immediately follows language stating, "the Parties have relied on their own judgment, belief, knowledge, and the information available to them . . . ." and they have not relied "upon any statement or representation, or the absence of any statement or representation, of any other Party." ECF No. 4-1 ¶ 6.

Similar to the contract in *Mitec*, the Settlement Agreement contains multiple disclaimers. *Cf.* 605 F.3d at 624. The anti-reliance provision specifically waives claims for fraudulent inducement—the type of claim Plaintiffs attempt to allege—and the integration clause indicates the Settlement Agreement is the entirety of the parties' agreement. *See* ECF No. 4-1 ¶¶ 6, 10a. Thus, Plaintiffs' alleged reliance on the oral representations seems "utterly unjustified in the face

30

of the [Settlement Agreement's] clear written contradiction." *Mitec*, 605 F.3d at 624 (internal

quotation marks and citation omitted). Although the Settlement Agreement does not expressly

contemplate the subject matter underlying Plaintiffs' fraudulent inducement claim, its waiver

of a fraudulent inducement claim is sufficiently specific to preclude a fraudulent inducement

claim as suggested by *Whalen* and applied in *Mitec. Cf. Whalen*, 545 N.W.2d at 294; *Mitec*,

605 F.3d at 642. Finally, the Settlement Agreement accounts for the circumstances Plaintiffs

rely on to support their fraudulent inducement claim, by considering representations made

during mediation and considering a party's ability to base a suit on such representations. *See*

ECF No. 4-1 ¶ 6; *cf. Whalen*, 545 N.W.2d at 294; 2010 WL 605651, at *9-11. For these reasons,

the Settlement Agreement precludes Plaintiffs' fraudulent inducement claim alleged in Count X.

### 2.    Fraudulent Inducement (Count X)

Although the Court determines the Settlement Agreement precludes Plaintiffs' fraudulent

inducement claim, the Court nonetheless considers its merits.

Under Iowa law, "settlement agreements are essentially contractual in nature." *Phipps v.

Winneshiek Cnty.*, 593 N.W.2d 143, 146 (Iowa 1999). And the "general principles of contract

law apply to their creation and interpretation." *Est. of Cox by Cox v. Dunakey & Klatt, P.C.*,

893 N.W.2d 295, 302 (Iowa 2017) (internal quotation marks and citation omitted). To state a

claim for fraudulent inducement of a contract under Iowa law, the plaintiff must allege:

representation, falsity, materiality, scienter, intent to deceive, reliance, and resulting injury and

damage. *Whalen*, 545 N.W.2d at 294.

The first three elements are "frequently treated as a single element and referred to as

fraudulent misrepresentation." *Sinnard v. Roach*, 414 N.W.2d 100, 105 (Iowa 1987). To be

actionable "the misrepresentation must relate to a material matter known to the party . . . which it

is his legal duty to communicate to the other contracting party whether the duty arises from

a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances." *Id.* (internal quotation marks and citation omitted) (omission in original). "Scienter is the knowledge of the falsity of a material representation." *Hyler v. Garner*, 548 N.W.2d 864, 871 (Iowa 1996). Scienter can be established by showing "the defendant had actual knowledge of the falsity." *McGough v. Gabus*, 526 N.W.2d 328, 331 (Iowa 1995).

Iowa law requires "reliance on the representation to be justified, not reasonable." *Spreitzer*, 779 N.W.2d at 736–37; *see also Lockard v. Carson*, 287 N.W.2d 871, 878 (Iowa 1980) (stating standard). "[T]he standard requires plaintiffs to utilize their abilities to observe the obvious, and the entire context of the transaction is considered to determine if the justifiable-reliance element has been met." *Spreitzer*, 779 N.W.2d at 737. In the case of oral representations, "reliance on [an] oral representation by a plaintiff can be utterly unjustified in the face of a clear written contradiction." *Id.* at 737–38. And "a plaintiff cannot close his or her eyes to an obvious contradiction." *Id.* at 738.

Additionally, claims alleging fraud must meet a heightened pleading standard. *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783–84 (8th Cir. 2009); *Miller*, 2014 WL 12601040, at *9–10 (determining plaintiff met Rule 9(b) pleading standard when alleging fraudulent inducement claim); *see also Hyler v. Garner*, 548 N.w.2d 864, 870–71 (Iowa 1996) (discussing remedy of rescission in relation to fraudulent inducement claim). Federal Rule of Civil Procedure 9(b) requires a party to "state with particularity the circumstances constituting fraud." To satisfy Rule 9(b), "the complaint must allege such matters as the time, place, and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Drobnak*, 561 F.3d at 783 (internal quotation marks and citation omitted). Essentially, the complaint must state the "who, what, when, where, and how" of the fraud. *Great Plains Tr. Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 995 (8th Cir. 2007). "Malice,

intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ.

P. 9(b). "[C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are

not sufficient to satisfy the rule." *Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 746

(8th Cir. 2002) (alteration in original) (internal quotation marks omitted) (quoting *Com. Prop.

Invs., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639, 644 (8th Cir. 1995)). Courts must consider

Rule 9(b) "in the context of the general principles of the Federal Rules, the purpose of which

is to simplify pleading. Thus, the particularity required by Rule 9(b) is intended to enable the

defendant to respond specifically and quickly to potentially damaging allegations." *U.S. ex rel.

Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003).

Plaintiffs do not adequately plead fraud as required under Federal Rule of Civil

Procedure 9(b). *See* Fed. R. Civ. P. 9(b). Par alleges:

> [d]uring the mediation, Wolfe Clinic fraudulently told [him] that it had not
> discouraged key referring optometrists from referring patients to him. Wolfe Clinic
> also failed to tell [him] it had contacted potential out-of-state employers and made
> disparaging comments, such as [he] was disruptive at Wolfe Clinic. During the
> mediation, Wolfe Clinic's legal counsel assured . . . Par and his counsel that no
> such communications had occurred.

ECF No. 4 ¶ 27. Their allegations regarding "Wolfe Clinic's" fraudulent statements are insufficient

to meet the Rule 9(b) standard. *Cf. Schaller Tel. Co.*, 298 F.3d at 746. Plaintiffs' complaint

fails to identify who made the affirmative misstatements regarding "key referring optometrists"

on behalf of Wolfe Clinic and when these statements were made. *Cf. Great Plains Tr. Co.*,

492 F.3d at 995. Additionally, the complaint fails to indicate which optometrists the alleged

affirmative misstatements concerned. Without information identifying who made the statements,

when the statements were made, or identifying the referring optometrists, Defendants cannot

respond to Plaintiffs' allegations about the affirmative misstatements. *Cf. Costner*, 317 F.3d at

888.

Plaintiffs' allegations regarding "Wolfe Clinic's" fraudulent omissions at the mediation regarding "out-of-state employers" and "disparaging comments" are similarly insufficient to meet the Rule 9(b) pleading standard. *See* ECF No. 4 ¶ 27; *cf. Schaller Tel. Co.*, 298 F.3d at 746. These allegations lack specificity. Once again, Plaintiffs fail to identify who on behalf of Wolfe Clinic omitted this information. *Cf. Great Plains Tr. Co.*, 492 F.3d at 995. They also fail to identify the "out-of-state employers," provide specific factual information about the alleged omitted information, or provide any facts regarding the substance and timing of the alleged "disparaging" statements. Plaintiffs' broad allegations are insufficiently broad to allege the who, what, when, where, and why of the alleged fraudulent omission. *Cf. id.* Without specific information, Defendants cannot respond to Plaintiffs' allegations regarding "Wolfe Clinic's" omissions. *Cf. Schaller Tel. Co.*, 298 F.3d at 746.

Finally, Plaintiffs' allegations regarding Wolfe Clinic's attorney's denial fails to meet the Rule 9(b) pleading standard. *Cf. id.* Plaintiffs appear to allege fraud by claiming Wolfe Clinic's attorney fraudulently denied Wolfe Clinic's statements and omissions. *See* ECF No. 4 ¶ 27. They provide minimal, generalized information about the attorney's alleged fraudulent denial. *See, e.g., id.* ¶¶ 27, 81–85. The complaint does not identify the attorney. Importantly, the single paragraph allegation about the attorney's denial lacks context and specificity. The allegation does not indicate what the attorney provided assurances about or in response to. The complaint does not indicate what communications elicited the attorney's allegedly fraudulent denial. The complaint also lacks specificity about the substance of the attorney's denial. As explained above, Plaintiffs' allegation lacks factual information about the conduct or conversations giving rise to the attorney's denial—including identifying the optometrists and out-of-state employers, and providing information as to the timing and substance of the purported disparaging comments. *See id.* ¶¶ 27, 81–85. Without factual information to support and contextualize Plaintiffs'

single assertion of the attorney's fraudulent denial, Plaintiffs' allegation is overly broad and conclusory. *Cf. Schaller Tel. Co.*, 298 F.3d at 746. As a result, Defendants cannot respond to Plaintiffs' generalized allegation regarding Wolfe Clinic's attorney. *Cf. Drobnak*, 561 F.3d at 783; *Costner*, 317 F.3d at 888.

Even if Plaintiffs' complaint adequately pleaded fraud, it fails to plausibly allege justifiable reliance, as required to allege a claim for fraudulent inducement. *Cf. Whalen*, 545 N.W.2d at 294. By signing the Settlement Agreement containing the anti-reliance clause, Par indicated he entered into the Agreement "without reliance upon any statement or representation, or the absence of any statement or representation, of any other party." ECF No. 4-1 ¶ 6. "The entire context of the transaction," including Par's representation by counsel during the mediation and his decision to sign the agreement waiving future fraudulent inducement claims, precludes finding Plaintiffs justifiably relied on the alleged misrepresentations. *Spreitzer*, 779 N.W.2d at 737. Due to the contradiction contained in the written Settlement Agreement Par signed, Plaintiffs cannot now argue Par justifiably relied on Defendants' or Defendants' attorney's statements at the mediation. *Cf. id.* at 737–38. As such, Plaintiffs' complaint fails to allege justifiable reliance to support his fraudulent inducement claim.

Because Plaintiffs' complaint fails to meet the pleading standard required to allege fraud and fails to plausibly allege justifiable reliance as required to state a claim for fraudulent inducement, the Court dismisses Count X.

### 3. Rescission (Count XII)

Rescission is an available remedy for the tort of fraudulent inducement. *Hyler*, 548 N.W.2d at 870–71. "Because the remedy of rescission is seen as less severe than an award of damages, rescission has traditionally been available upon a lesser showing" than damages for a fraudulent inducement claim. *Id.* at 871. "[T]he proof required for rescission based on [fraudulent

inducement] under Iowa law is less demanding than the proof necessary for the tort of [fraudulent inducement]."[2] *Id.* When a plaintiff seeks rescission, "relief may be obtained without proof of scienter or pecuniary damage." *Id.*; *see also First Nat'l Bank in Lenox v. Brown*, 181 N.W.2d 178, 181 (Iowa 1970) (stating in equity, "[f]raud may . . . be constructed from circumstances, whereas the law must find it as a fact. Furthermore, equity may grant relief absent a showing of scienter or pecuniary damage").

For the reasons discussed above, Plaintiffs' rescission claim is dismissed because they fail to allege fraudulent inducement justifying a remedy in equity. *See supra* Part IV.B.2 Notwithstanding the less demanding proof necessary to obtain the requested relief, Plaintiffs fail to allege justifiable reliance, as required to state a claim for the tort giving rise to the remedy of rescission. *See id.* As such, the Court dismisses Plaintiffs' rescission claim alleged in Count XII. *Cf. Hyler*, 548 N.W.2d at 870–71.

### C.    Civil Conspiracy and Tort Claims

Defendants argue the Court should dismiss any aspect of Plaintiffs' claims alleging defamation per se (Count V), defamation by omission (Count VI), false light (Count VII), tortious interference (Counts VIII and IX), and civil conspiracy (Count XI) predicated on conduct occurring prior to the effective date of the Settlement Agreement because the Settlement

---

[2] *Hyler v. Garner* explains the standard for rescission based on the tort of fraudulent misrepresentation. 548 N.W.2d at 870–71. Under Iowa law, the elements for fraudulent misrepresentation and fraudulent inducement are the same. *See McIrvin*, 2010 WL 605651, at *9; *compare Hyler*, 548 N.W.2d at 871, *with Whalen*, 545 N.W.2d at 294.

Agreement's release of liability bars these claims.[34] *See* ECF No. 48 ¶¶ 10; ECF No. 48-1 at 33. Defendants contend the parties signed the Settlement Agreement waiving all "known and unknown" claims "arising from the beginning of time to the Effective Date of this Agreement." *Id.* (quoting ECF No. 4-1 ¶ 2). Defendants argue aspects of Counts V–IX, and XI are precluded because the facts giving rise to them occurred "in whole or in part" before December 16, 2020— the effective date of the Settlement Agreement. ECF No. 48 ¶ 10. Alternatively, the Defendants request the Court strike allegations of conduct that occurred prior to December 16, 2020. *Id.* ¶ 11. Plaintiffs argue the Settlement Agreement was procured by fraud and therefore the release of liability may not be enforceable. ECF No. 77 at 19. They argue Defendants' motion based on the release of liability is premature. *Id.* Alternatively, they argue the claims at issue "arose" as defined by law after December 16, 2020. *Id.* at 20.

"There is nothing in the nature of a compromise contract, a release of liability, or a covenant not to sue, that calls for any different construction or treatment at the hands of a court, than that afforded to other contracts." *Jordan v. Brady Transfer & Storage Co.*, 284 N.W. 73, 82 (Iowa 1939). "In the construction of written contracts, the cardinal principle is that the intent of the parties must control, and except in cases of ambiguity, this is determined by what the contract itself says." *Peak v. Adams*, 799 N.W.2d 535, 543 (Iowa 2011) (internal quotation marks and citation omitted). "The law favors settlement of controversies. . . . The typical settlement resolves uncertain claims

---

[3] Defendants also argue the Court should dismiss any aspect of Plaintiffs' antitrust claims (Count I) predicated on conduct occurring prior to the effective date of the Settlement Agreement. ECF No. 48-1 at 33. Because the Court finds Plaintiffs fail to plausibly allege monopolization or attempted monopolization under federal or Iowa law, the Court does not address Defendants' alternative argument regarding Count I here. *See supra* Part IV.A.

[4] Defendants do not offer alternative arguments supporting dismissal as to Par's defamation claims (Counts V and VI), false light claim (Count VII), intentional interference claims (Count VIII and IX), and civil conspiracy (XI). *See* ECF No. 48 ¶¶ 10–11. The Court does not address other bases to dismiss these claims.

and defenses, and the settlement obviates the necessity of further legal proceedings between the settling parties. . . . [V]oluntary settlements of legal disputes should be encouraged, with the terms of settlements not inordinately scrutinized." *Waechter v. Aluminum Co. of Am.*, 454 N.W.2d 565, 568 (Iowa 1990) (internal quotation marks and citation omitted).

The release of liability clause in the Settlement Agreement is enforceable. The release of liability clause "clearly identifies the individuals who are to be considered released parties." *Cf. Grabill v. Adams Cnty. Fair & Racing Ass'n*, 666 N.W.2d 592, 596 (Iowa 2003) (upholding a release of liability clause that precluded claims for individual negligence). It identifies the Wolfe Releasees as "[t]he Wolfe Parties and all of their shareholders, members, owners, parent entities, subsidiaries, officers, employees, principals, agents, insurers, successors, and assigns." ECF No. 4-1 ¶ 1. The release of liability clause indicates with precise language the parties' intent to release the Wolfe Releasees from certain types of claims relating to the issues they mediated. *See Id.* ¶¶ 1–2; *cf. Peak*, 799 N.W.2d at 543. It prohibits Par from suing Defendants on "all claims, debts, actions, causes of action, damages, and liabilities, known or unknown . . . from the beginning of time to the Effective Date of th[e] Agreement[, December 16, 2020]." ECF No. 4-1 ¶ 2. It also prohibits claims related to "Par's employment with any of the Wolfe Parties." *Id.* The contractual language is unambiguous and sets forth the parties' intent. *Cf. Waechter*, 454 N.W.2d at 568; *Peak*, 799 N.W.2d at 543.

Aside from fraudulent inducement, Plaintiffs allege no other facts or causes of action as to the Settlement Agreement's unenforceability. Because the Court finds Plaintiffs fail to allege fraudulent inducement, the Settlement Agreement is enforceable. *See supra* Part IV.B.1–3. As such, the Court enforces the release of liability clause releasing Defendants from claims arising before December 16, 2020. ECF No. 4 ¶¶ 1–2.

Plaintiffs' complaint imprecisely pleads the dates and time periods when Defendants

undertook the alleged conduct. *See generally* ECF No. 4. Some of Plaintiffs' allegations are based on conduct occurring prior to the effective date of the Settlement Agreement. *See* ECF No. 4 ¶¶ 26–28, 81–82, 84–85, 101 (first bullet point). Other allegations do not include dates or time periods. *Id.* ¶¶ 100, 101–10, 114–20, 121–28. Finally, some of Plaintiffs' allegations clearly allege conduct occurring after the effective date of the Settlement Agreement. *Id.* ¶¶ 5–6, 29–39, 89–90, 93, 97–99, 111–13. As such, the Court dismisses Plaintiffs' claims for defamation per se (Count V), defamation by omission (Count VI), false light (Count VII), intentional interference with a contract (Count VIII), intentional interference with business relations (Count XI), and civil conspiracy (Count XI) to the extent they rely on conduct occurring before December 16, 2020. Claims based on conduct occurring after December 16, 2020, remain.

### D.   Remand of Remaining State Law Claims

 "When a district court dismisses federal claims over which it has original jurisdiction, the balance of interests usually 'will point toward declining to exercise jurisdiction over the remaining state law claims.'" *In re Canadian Import Antitrust Litigation*, 470 F.3d 785, 792 (8th Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 US. 343, 350 n.7 (1988)); *see also Gibson v. Weber*, 433 F.3d 642, 647 (8th Cir. 2006); 28 U.S.C. § 1367(c)(3).

The Court declines to exercise jurisdiction over Plaintiffs' remaining state law claims. The Court's subject-matter jurisdiction over this case is premised on Plaintiffs' federal claims for monopolization and attempted monopolization, under § 2 of the Sherman Act as alleged in Count I. *See* ECF No. 4 ¶¶ 169–81; 28 U.S.C. §§ 1331, 1337.  The Court's jurisdiction over the related state-law claims contained in Counts II through XIII is invoked solely pursuant to 28 U.S.C. § 1367, which provides for supplemental jurisdiction over state-law claims that form part of the same "case or controversy" over which the Court otherwise has jurisdiction. *Cf. TheMLSonline.com, Inc. v. Reg. Multiple Listing Serv. of Minn., Inc.*, 840 F. Supp. 2d 1174,

1182 (D. Minn. 2012). For the reasons stated above, the Court dismisses Plaintiffs' federal monopolization and attempted monopolization claims. *See supra* Part IV.A. After such claims are dismissed, it no longer has federal question jurisdiction over Plaintiffs' complaint. For this reason, the Court declines to exercise continuing jurisdiction over Plaintiffs' claims for breach of paragraph 7 of the Settlement Agreement (Count II), breach of paragraph 9 of the Settlement Agreement (Count III), Breach of the implied covenant of good faith and fair dealing (Count IV), and punitive damages (Count XIII). In addition, to the extent Plaintiffs' claims for defamation per se (Count V), defamation by omission (Count VI), false light (Count VII), intentional interference with a contract (Count VIII), intentional interference with business relations (Count XI), and civil conspiracy (Count XI) are based on conduct occurring after December 16, 2020, the Court declines to exercise jurisdiction over these claims. The Court remands Counts II–IX, XI, and XIII back to the District Court for Polk County, Iowa.

## IV.    CONCLUSION

Plaintiffs fail to plausibly allege antitrust standing and a relevant product market as required to sustain federal and state law claims for monopolization and attempted monopolization. As such, the Court dismisses Count I. Additionally, Plaintiffs fail to meet the heightened pleading standard for fraud and the Settlement Agreement precludes their fraudulent inducement claims. Due to the Settlement Agreement's language, Plaintiffs fail to allege justifiable reliance to support their claims for fraudulent inducement and recission. As such, the Court dismisses Counts X and XII. Finally, the Court declines to exercise jurisdiction over Plaintiffs' remaining state law claims for breach of paragraph 7 of the Settlement Agreement (Count II), breach of paragraph 9 of the Settlement Agreement (Count III), Breach of the implied covenant of good faith and fair dealing (Count IV), and punitive damages (Count XIII). In addition, to the extent Plaintiffs' claims for defamation per se (Count V), defamation by omission (Count VI), false light (Count VII),

intentional interference with a contract (Count VIII), intentional interference with business relations (Count XI), and civil conspiracy (Count XI) are based on conduct occurring after December 16, 2020, the Court declines to exercise jurisdiction over these claims.

**IT IS ORDERED** that the Defendants Wolfe Clinic, P.C., Jared S. Nielsen, Kyle J. Alliman, and David D. Saggau's Partial Motion to Dismiss, ECF No. 48, is **GRANTED**.

The parties are responsible for their own costs.

Because the Court relies on information contained in sealed portions of the record, the Court files this Order under seal. The Order shall be sealed for a period of thirty days to provide the parties the opportunity to request redactions to the Order. Parties shall provide the Court with joint proposed redactions via email to chambers by close-of-business June 9, 2022.

**IT IS SO ORDERED.**

Dated this 10th day of May, 2022.

REBECCA GOODGAME EBINGER
UNITED STATES DISTRICT JUDGE